**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**

**CLARKSBURG DIVISION**

ELECTRONICALLY
FILED
Mar 28 2017
U.S. DISTRICT COURT
Northern District of WV

| | |
|---|---|
| **DEREK R. JOHNSON and STONEWALL J. WEBSTER, III, individually and on behalf of all others similarly situated,** | |
| **Plaintiffs,** | **CASE NO.** _1:17-cv-47_ |
| **v.** | **JUDGE** _Keeley_ |
| **FCA US LLC; FIAT CHRYSLER AUTOMOBILES N.V.; ROBERT BOSCH GMBH; and ROBERT BOSCH LLC,** | |
| **Defendants.** | |

**COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................................1

II.     NATURE OF THE ACTION ................................................................................................1

III.    PARTIES ...............................................................................................................................7

        A.      Plaintiffs ....................................................................................................................7

        B.      Defendants .................................................................................................................8

IV.     PLAINTIFFS' FACTS..........................................................................................................10

V.      JURISDICTION AND VENUE ..........................................................................................13

VI.     FACTS COMMON TO ALL COUNTS...............................................................................15

        A.      The Defeat Device Scheme......................................................................................15

        B.      Applicable Emissions Standards & Testing.............................................................26

        C.      Defendants Marketed the Class Vehicles as Environmentally
                Friendly, Emissions-Compliant, Fuel-Efficient, and Reliable................................27

VII.    CLASS ACTION ALLEGATIONS ......................................................................................32

        A.      Numerosity: Federal Rule of Civil Procedure 23(a)(1) ..........................................34

        B.      Commonality and Predominance: Federal Rule of Civil Procedure
                23(a)(2)  and 23(b)(3) .............................................................................................34

        C.      Typicality: Federal Rule of Civil Procedure 23(a)(3)..............................................35

        D.      Adequacy: Federal Rule of Civil Procedure 23(a)(4) ..............................................36

        E.      Declaratory and Injunctive Relief: Federal Rule of Civil Procedure
                23(b)(2) ....................................................................................................................36

        F.      Superiority: Federal Rule of Civil Procedure 23(b)(3)............................................36

VIII.   ANY APPLICABLE STATUES OF LIMITATION ARE TOLLED.........................................37

        A.      Tolling Due To Fraudulent Concealment .................................................................38

        B.      Estoppel....................................................................................................................38

i

IX.     CAUSES OF ACTION ..................................................................................39

        A.      Claims Asserted on Behalf of all Classes ........................................................39

                COUNT I RACKETEER INFLUENCED AND CORRUPT
                        ORGANIZATIONS ACT ("RICO") Violation of 18 U.S.C.
                        § 1962(c)-(d) ..................................................................39

                        a.      Description of the Defeat Device RICO Enterprise..................40

                                (i)     The Fiat-Chrysler Entity Defendants .............................43

                                (ii)    VM Motori and General Motors ....................................43

                                (iii)   The Bosch Defendants ..................................................44

                        b.      The Defeat Device RICO Enterprise Sought to
                                Increase Defendants' Profits and Revenues...............................47

                        c.      Mail and Wire Fraud .................................................................50

                COUNT II FRAUD BY CONCEALMENT (Common Law) ..........................57

                COUNT III  BREACH OF CONTRACT ...................................................62

                COUNT IV IMPLIED AND WRITTEN WARRANTY Magnuson
                        - Moss Warranty Act (15 U.S.C. §§ 2301, et seq.)................................63

                COUNT V UNJUST ENRICHMENT.................................................................64

                COUNT VI VIOLATIONS OF THE DELAWARE CONSUMER
                        FRAUD ACT (6 Del. Code § 2513, et seq.).........................................65

                COUNT VII BREACH OF THE IMPLIED WARRANTY OF
                        MERCHANTABILITY (6 Del. Code §§ 2-314 and 2A-
                        212) .................................................................69

                COUNT VIII BREACH OF EXPRESS WARRANTY (6 Del.
                        Code §§ 2-313 and 2A-210) ...............................................70

        B.      West Virginia State Claims.................................................................74

                COUNT IX VIOLATIONS OF THE CONSUMER CREDIT AND
                        PROTECTION ACT (W. Va. Code § 46A-1-101, et seq.) ..................74

                COUNT X BREACH OF IMPLIED WARRANTY OF
                        MERCHANTABILITY (W. Va. Code §§ 46-2-314 and 46-
                        2A-212).................................................................79

COUNT XI  BREACH OF EXPRESS WARRANTY (W. Va. Code §§ 46-2-313 and 46-2A-210).................................................80

COUNT XII BREACH OF NEW MOTOR VEHICLE WARRANTY (WEST VIRGINIA "LEMON LAW") (W. Va. Code §§ 46A-6A-1, et seq.) ..........................82

C.    North Carolina State Claims .........................................85

COUNT XIII VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (N.C. Gen. Stat. §§ 75-1.1, et seq.).................................85

COUNT XIV  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.C.G.S.A. §§ 25-2-314 and 252A-212) ..................................................90

COUNT XV  BREACH OF EXPRESS WARRANTY (N.C.G.S.A. §§ 25-2-313 and 252A-210 ..........................................91

X.    REQUEST FOR RELIEF .............................................92

XI.   DEMAND FOR JURY TRIAL ......................................94

## I.    INTRODUCTION

Plaintiffs Derek R. Johnson and Stonewall J. Webster, III, individually and on behalf of all others similarly situated ("the Class"), alleges the following against auto manufacturer/distributor FCA US LLC and its corporate parent Fiat Chrysler Automobiles N.V. (together, "Fiat Chrysler"), and supplier Robert Bosch GmbH, and its subsidiary Robert Bosch LLC (together, "Bosch") (collectively, "Defendants"); based where applicable on personal knowledge, information and belief, and the investigation of counsel. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

## II.    NATURE OF THE ACTION

1.    This action relates to Fiat Chrysler's promotion and sale of EcoDiesel® branded diesel-powered light trucks and SUVs ("Class Vehicles"). These vehicles are and were advertised as offering efficient fuel economy; desirable performance; and clean, environmentally friendly emissions. In reality, these vehicles (like the well-known Volkswagen diesel vehicles) were equipped with a "defeat devices" designed to cheat federal and state emission testing for oxides of nitrogen ("NOx"), thereby deceiving the Environmental Protection Agency ("EPA"), the California Air Resources Board ("CARB"), and other regulators into approving for sale more than 100,000 non-compliant Class Vehicles in order that consumers would be deceived into purchasing them.

2.    The defeat devices at issue in this case consist of software algorithms installed on engine management systems that detect when the vehicle is undergoing emissions testing (versus driving on the road) and adjusts the functioning of the vehicles' sophisticated emissions controls to ensure that they will pass emissions testing. At all other times *except* when undergoing emissions testing, these vehicles emit vastly more harmful pollutants than federal and state law

allow. As described below, the EPA has identified eight devices used to detect testing mode which function as defeat devices.

3.        Fiat Chrysler did not act alone in its deception of consumers, who were the targets of this fraud. Bosch, a long-time supplier of automotive technology to Fiat Chrysler, has now admitted to German regulators that it designed defeat devices for Fiat models. Each EcoDiesel® vehicle is managed through a Bosch control unit equipped with sophisticated software that detects when vehicles are in testing mode and controls their performance and emissions. Bosch retains control over the software throughout the development process, and collaborated with Fiat Chrysler to develop and to implement the defeat devices in the Class Vehicles, which served no legitimate purpose and were not disclosed to U.S. regulators.

4.         Before introducing the Class Vehicles into the U.S. stream of commerce (or causing the same), Fiat Chrysler was required to first apply for, and obtain, an EPA-administered Certificate of Conformity ("COC"), certifying that the vehicles comported with the emission standards for pollutants enumerated in 40 C.F.R. §§ 86.1811-04, 86.1811-09, and 86.1811-10.

5.        The Clean Air Act ("CAA") and its implementing regulations expressly prohibit automakers, like Fiat Chrysler, from introducing a new vehicle into the stream of commerce without a valid EPA COC. *See* 42 U.S.C. § 7522(a)(1). Moreover, vehicles must be accurately described in the COC application "in all material respects" to be deemed covered by a valid COC. *See* 40 C.F.R. §§ 86.1848-10(c)(6). California's emission standards were even more stringent than those of the EPA. California's regulator, CARB, requires a similar application from automakers to obtain an EO, confirming compliance with California's emission regulations, before allowing the vehicle onto California's roads.

6.      The Class Vehicles differed in "material respects" from the specifications described in their COC applications, because they were equipped with undisclosed Auxiliary Emission Control Devices ("AECDs"); specifically, the software code described above, that functioned as an illegal "defeat device." The CAA expressly prohibits "defeat devices," defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 86.1803-01; *see also id.*, § 86.1809-10. ("No new light-duty vehicle, light-duty truck, medium duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device."). Moreover, the CAA prohibits the sale of components used as defect devices, "where ***the person knows or should know*** that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3) (emphasis added). Finally, in order to obtain a COC, automakers must submit an application, which discloses all AECDs installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device. Regulators may then determine if they will approve the AECDs or not.

7.      On January 12, 2017, the EPA acknowledged Defendants' deceit and issued a Notice of Violation ("NOV") to Fiat Chrysler for violations of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401-7671q, and its implementing regulations, noting ***eight*** undisclosed AECDs.

8.      Also on January 12, 2017, CARB issued a Notice of Violation to Fiat Chrysler after detecting undisclosed "auxiliary emissions control devices" ("AECDs") in EcoDiesel® vehicles. The CARB announcement noted that Fiat Chrysler failed to disclose these devices, which "significantly increase" NOx emissions when activated.

3

9.    German, French and Italian regulators have also launched investigations into cheating allegations in Fiat Chrysler vehicles sold in the European Union.[1] The Kraftfahrt-Bundesamt ("KBA"), or the German Federal Transport Authority,  the role filled in the U.S. by the EPA, met separately with Fiat and Bosch representatives, ultimately concluding that the vehicles it tested contained defeat devices in contravention of the law, although these results have not been made public.  In March 2017, Bosch's offices were raided by German prosecutors. However, it is not clear that these raids and investigations will lead to criminal prosecutions in Germany or Italy, notwithstanding Fiat and Bosch's illegal acts.  It may be that the U.S. is the only forum in which consumers will see justice.

10.    Because the COCs for the Class Vehicles were fraudulently obtained, the Class Vehicles were never covered by valid COC and, thus, were never offered legally for sale. Defendants failed to disclose these facts from the EPA, CARB and other regulators and Fiat Chrysler continued to sell and lease the illegal Class Vehicles.

11.    Due to the existence of the Defeat Devices, the vehicles sold to Plaintiffs and the Class are not what was promised. Consumers believed Fiat Chrysler's promises that the EcoDiesel® vehicles are reliable, low-emission, environmentally friendly vehicles with efficient fuel economy and strong performance. Specifically, the Jeep Grand Cherokee EcoDiesel was advertised as "a marvel of modern engineering" that "delivers quiet, clean-diesel technology

---

[1] Gilles Guillaume, Simon Carraud & Agnieszka Flak, *Diesel cheating inquiries in Europe widen to Renault and* Fiat, THE GLOBE AND MAIL (Jan. 13, 2015), http://www.theglobeandmail.com/report-on-business/international-business/european-business/paris-prosecutor-opens-probe-into-emissions-cheating-at-renault-source/article33614291/ .

with low $CO_2$ emissions" along with "Awe-inspiring performance combined with Best-in-Class fuel economy."[2]

12.    All the while, these consumers have unwittingly been among the highest polluters on the road, despite having paid a premium for purportedly clean vehicles. The manufacturer's warranties, advertising, and other statements about the vehicles' COCs, legal compliance and environmental friendliness are patently false and misleading, and to the extent that the Class Vehicles need to be repaired or "fixed" to come into compliance, they are not reliable, as advertised.

13.    Plaintiffs and Class members are individuals and businesses who purchased or leased a Class Vehicle in the United States. The Class Vehicles include the 2014–2016 Ram 1500 pickup truck and the 2014–2016 Jeep Grand Cherokee SUV, when equipped with Fiat Chrysler's 3.0-liter EcoDiesel® engine.

14.    Through their misrepresentations to regulators and to consumers, Defendants induced Plaintiffs and Class members to purchase or lease the Class Vehicles, which do not perform as represented. Class members would not have purchased or leased the Class Vehicles had they known the truth of Defendants' fraudulent scheme, in particular, that the Class Vehicles were equipped with undisclosed AECDs which functioned as an illegal defeat device. In fact, no consumer in the U.S. would or could have purchased any of the Class Vehicles if not for Defendants' fraud, because the EPA COCs that rendered them legal to sell in the United States were obtained only by cheating.

---

[2] *2017 Jeep Grand Cherokee*
https://www.jeep.com/en/jeep-capabilities/eco-diesel-calculator/#diesel-engine (last visited March 10, 2017).

15.     Plaintiffs and Class members suffered economic damages at the time they purchased their Class Vehicles, which were not legally sold to Plaintiffs and Class members and pollute the environment at levels far in excess of the legal limits.

16.     To the extent the Class Vehicles can be repaired or retrofitted to pass federal and state emission requirements, they will nevertheless continue to depreciate in value and cause economic loss at a rate greater than regular depreciation because any repairs or retrofits may reduce the Class Vehicles' performance, torque, fuel efficiency, durability, or reliability—thereby reducing market value and increasing the costs of ownership and operation.

17.     Indeed, asset valuations of Fiat Chrysler have already reflected depreciation following the revelation of the notices of violation. As Moody Investor Services reported, "[i]n the case of Fiat Chrysler's emissions violations, if the affected vehicles cannot be sold or must be recalled and fixed, we would expect similar ABS performance effects as those of VW-sponsored ABS. Primarily, there could be a negative effect on the performance of auto lease ABS if delays in the availability of a fix, combined with lower consumer confidence and demand, increases loss severities upon vehicle repossession or after lease turn-in. In lease transactions, when the transaction servicers or sponsors are unable to re-sell the vehicle or must wait until fixes are made to remarket vehicles that have been repossessed or turned-in, the residual realizations used to pay the ABS noteholders are delayed or impaired."[3]

18.     The Bosch Defendants participated in this conspiracy to defraud U.S. consumers, knowing that the CPU and software it delivered were designed to detect emissions testing cycles. For example, Bosch has already admitted that it designed and delivered defeat devices for Fiat models sold in the EU that specifically detected a 22 minute cycle, which is the length of the

---

[3] *Fiat Chrysler's Emissions Issues Are Credit Negative for Some US Auto ABS*, MOODY'S INVESTOR SERVICE (Jan. 16, 2017).

testing cycle in Europe.  Bosch engineers were well aware of this, and the explanation that

detecting a 22 minute cycle and thereafter altering engine and emissions performance was for the

purpose of preventing engine degradation is not plausible.  Although the Federal emissions

testing protocol extends up to 30 minutes in the U.S., the EPA specifically identified eight

undisclosed AECDs in Jeep/Ram Class Vehicles in its Notice of Violation letter; these

undisclosed AECDs are likewise difficult to justify for engine protection or dismiss in any other

way.

19.     On behalf of themselves, the Nationwide Class, and the State Classes, Plaintiffs

hereby bring this action for violations of the federal Racketeer Influenced and Corrupt

Organizations Act (18 U.S.C. § 1961 *et seq.* ("RICO")); Magnuson-Moss Warranty Act

(15 U.S.C. § 2301 *et seq.* ("MMWA")); consumer protection laws of the states and the District of

Columbia; and for common law fraud, contract, warranty, and unjust enrichment claims.

20.     Plaintiffs seek monetary damages, restitution, pollution mitigation, and injunctive

and other equitable relief. In addition, Plaintiffs and Class members are entitled to a significant

award of punitive or exemplary damages because Defendants deliberately, and with malice,

deceived Plaintiffs and Class members for a period of years.

### III.     PARTIES

**A.     Plaintiffs**

21.     Plaintiff Derek R. Johnson is a citizen of West Virginia residing in Pentress,

Monongalia County.

22.     Plaintiff Stonewall J. Webster, III, is a citizen of North Carolina residing in

Mayodan, North Carolina.

**B.    Defendants**

23.    **FCA US LLC ("FCA")** is a limited liability company organized and existing under the laws of the State of Delaware, and is owned by holding company **Fiat Chrysler Automobiles N.V. ("Fiat")**, a Dutch corporation headquartered in London, United Kingdom (together, "Fiat Chrysler"). FCA was formed when Fiat acquired American automaker Chrysler. FCA's principal place of business and headquarters is at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

24.    FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled motor vehicles. FCA and its predecessor, Chrysler, are and were known as one of the "Big Three" American automakers (with Ford and General Motors). FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under the Chrysler, Dodge, Jeep, Ram, and Fiat brands. Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division.

25.    **Fiat Chrysler Automobiles N.V.**, the corporate parent of FCA, owns numerous European automotive brands in addition to FCA's American brands, including: Ferrari, Maserati, Alfa Romeo, Fiat Automobiles, Fiat Professional, Lancia, and Abarth. As of 2015, Fiat Chrysler is the seventh largest automaker in the world by unit production.

26.    Fiat also owns several auto parts manufacturers, including diesel engine manufacturer VM Motori. The "EcoDiesel®" engine at issue in this suit was developed and manufactured for Fiat by VM Motori. Fiat partially acquired VM Motori in early 2011 by purchasing a 50% stake, and took full ownership by acquired the remaining 50% from General Motors in 2013.

27.    FCA markets, distributes, warrants, sells and leases automobiles through its network of independent, franchised motor vehicle dealers. The dealers act as FCA's agents in

8

selling automobiles under the Fiat Chrysler name and disseminating vehicle information provided by Fiat Chrysler to customers. Fiat Chrysler is engaged in interstate commerce in that it sells vehicles through this network in every state of the United States.

28.    Fiat Chrysler and/or its agents designed, manufactured, and installed the EcoDiesel® engine system in the Class Vehicles. FCA designs, manufactures, markets, distributes, and sells two models of vehicle for which the EcoDiesel® option is available: the Ram 1500 and the Jeep Grand Cherokee. Fiat Chrysler developed and disseminated the owners' manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the Class Vehicles.

29.    At all relevant times, FCA and its agents marketed, distributed, warranted, sold and leased the Class Vehicles in West Virginia and throughout the U.S.

30.    **Robert Bosch GmbH ("Bosch GmbH")**—a German multinational engineering and electronics company headquartered in Gerlingen, Germany—is the parent company of **Robert Bosch LLC ("Bosch LLC")**—a Delaware limited liability company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan 48331(together, "Bosch"). At all material times, Bosch designed, manufactured, developed, tailored, reviewed, approved, and supplied elements of the device to FCA for use in the Class Vehicles.

31.    Both Bosch GmbH and Bosch LLC operate under the umbrella of the Bosch Group, which encompasses some 340 subsidiaries and companies. The Bosch Group is divided into four business sectors: Mobility Solutions (formerly Automotive Technology), Industrial Technology, Consumer Goods, and Energy and Building Technology. Bosch's sectors and divisions are grouped not by location, but by subject matter. In other words, Mobility Solutions includes knowledgeable individuals at both Bosch GmbH and Bosch LLC. Regardless of

whether an individual works for Bosch in Germany or the U.S., the employee holds him or herself out as working for Bosch. This collective identity is captured by Bosch's mission statement: "We are Bosch," a unifying principle that links each entity and person within the Bosch Group.

32.     Mobility Solutions is the largest Bosch Group business sector. In 2014, its sales came to 33.3 billion euros, amounting to 68 percent of total group sales. The Bosch Group is one of the leading automotive suppliers globally. In North America alone, Mobility Solutions had 2015 sales of $9.5 billion.

33.     Bosch operates 70 locations in the United States, with over 31,000 employees focusing on research in and production of technologies that are used in a variety of automotive applications. Bosch LLC operates Research and Technology Centers in Pittsburgh, Pennsylvania, Cambridge, Massachusetts, and Palo Alto, California.

34.     Bosch developed, tested, and manufactured the Electronic Diesel Control ("EDC") Unit 17, which is the EDC system used in the Class Vehicles. As set forth in detail herein, at all relevant times, Bosch and Fiat Chrysler worked collaboratively to program the EDC Unit 17 in the Class Vehicles.

## IV.     PLAINTIFFS' FACTS

35.     Plaintiff **DEREK R. JOHNSON**, a resident of Pentress, West Virginia, purchased a 2014 Jeep Grand Cherokee EcoDiesel® on or about December 6, 2014 at Urse Dodge Chrysler Jeep Ram in White Hall, West Virginia.

36.     Before buying the Jeep Grand Cherokee EcoDiesel®, Mr. Johnson, an alternative fuels engineer, researched low emissions diesel SUVs but ultimately decided to buy the Jeep over its competitors due to Defendants' promises regarding advanced clean diesel technology and reduced emissions. He relied on statements from FCA advertisements, websites and dealer

personnel, calling it "one of the cleanest and most economical diesels on the market" with "super low emissions [and] amazing fuel mileage."

37.     The fuel economy and low emissions of the Jeep Grand Cherokee EcoDiesel® were the primary reasons Mr. Johnson purchased the SUV.

38.     At the time of his purchase, Plaintiff had no idea that his vehicle could only perform as advertised by emitting pollutants, such as NOx, at levels much higher than legally permitted. Nor was Plaintiff aware that his vehicle had been outfitted with "defeat device" software, which constituted an undisclosed and unauthorized AECD that was designed to cheat emissions tests and deceive consumers and regulators as to the level of pollutants emitted under normal driving conditions. Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing Class Vehicles without proper emission controls has caused Plaintiff to suffer out-of-pocket loss, including but not limited to future attempted repairs, and increased depreciated value of the vehicles associated with the existence of the devices and any required repairs, including but not limited to potential reduced performance such as a reduction in calculated fuel economy, a decrease in peak horsepower, and/or a decrease in peak torque. Defendants knew about and willfully concealed the inadequate emission controls and defeat device software. Plaintiff and Class members purchased on the reasonable belief that their vehicles were environmentally responsible vehicles that complied with U.S. emissions standards, were properly EPA certified, and would retain the promised fuel economy and performance throughout the vehicles' useful life.

39.     Plaintiff selected and ultimately purchased his vehicle primarily for the EcoDiesel® system, as represented through advertisements and representations made by Fiat Chrysler. Plaintiff and each Class member have suffered an ascertainable loss as a result of

Defendants' omissions and/or misrepresentations associated with the EcoDiesel® engine system, including, but not limited to: the high premium paid for the EcoDiesel® engine option as compared to the gas-powered model of the vehicle; out-of-pocket losses; future attempted repairs; future additional fuel costs, decreased performance of the vehicles, and depreciated value of the vehicles associated with future repairs, including but not limited to potential reduced performance such as a reduction in calculated fuel economy, a decrease in peak horsepower; and/or a decrease in peak torque.

40.     Plaintiff **Stonewall J. Webster, III**, a resident of Mayodan, North Carolina, bought a 2016 Ram 1500 EcoDiesel on or about January 4, 2017 at Victory Dodge in Shallotte, North Carolina.

41.     Before buying the Ram 1500, he spent several months researching lower-emissions diesel trucks, but ultimately decided to buy the Ram over its competitors due to environmental concerns and great fuel mileage.

42.     The fuel economy and low emissions of the Jeep Grand Cherokee EcoDiesel® were the primary reasons Mr. Johnson purchased the SUV.

43.     At the time of his purchase, Plaintiff had no idea that his vehicle could only perform as advertised by emitting pollutants, such as NOx, at levels much higher than legally permitted. Nor was Plaintiff aware that his vehicle had been outfitted with "defeat device" software, which constituted an undisclosed and unauthorized AECD that was designed to cheat emissions tests and deceive consumers and regulators as to the level of pollutants emitted under normal driving conditions. Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing Class Vehicles without proper emission controls has caused Plaintiff to suffer out-of-pocket loss, including but not limited to future attempted

repairs, and increased depreciated value of the vehicles associated with the existence of the devices and any required repairs, including but not limited to potential reduced performance such as a reduction in calculated fuel economy, a decrease in peak horsepower, and/or a decrease in peak torque. Defendants knew about and willfully concealed the inadequate emission controls and defeat device software. Plaintiff and Class members purchased on the reasonable belief that their vehicles were environmentally responsible vehicles that complied with U.S. emissions standards, were properly EPA certified, and would retain the promised fuel economy and performance throughout the vehicles' useful life.

44.     Plaintiff selected and ultimately purchased his vehicle primarily for the EcoDiesel® system, as represented through advertisements and representations made by Fiat Chrysler. Plaintiff and each Class member have suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the EcoDiesel® engine system, including, but not limited to: the high premium paid for the EcoDiesel® engine option as compared to the gas-powered model of the vehicle; out-of-pocket losses; future attempted repairs; future additional fuel costs, decreased performance of the vehicles, and depreciated value of the vehicles associated with future repairs, including but not limited to potential reduced performance such as a reduction in calculated fuel economy, a decrease in peak horsepower; and/or a decrease in peak torque.

## V.    JURISDICTION AND VENUE

45.     This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) because there are more than 100 Class members in the proposed statewide West Virginia and North Carolina Classes; the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs; and complete diversity exists because Plaintiffs and the members of the proposed West Virginia and North Carolina

Classes are citizens of West Virginia and North Carolina, whereas Defendants are either organized in Delaware or overseas, and the U.S. Defendants have their principal places of business in Michigan. Subject-matter jurisdiction also arises under the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq.* The Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

46.     This Court has personal jurisdiction over the Plaintiffs because they submit to the Court's jurisdiction.  This Court has personal jurisdiction over the Defendants because they conduct substantial business in this District, and some of the actions giving rise to the Complaint took place in this District.  The Court also has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d).

47.     This Court has both specific and general personal jurisdiction over Defendants because they maintain minimum contacts with the United States, this judicial district, and this State. Defendants are subject to specific jurisdiction because they have purposely availed themselves of the West Virginia forum and West Virginia law. FCA and Fiat have sold hundreds or thousands of Class Vehicles to West Virginia citizens, including the Plaintiff, and have thus injured hundreds or thousands of West Virginia consumers through their deception. FCA and Fiat targeted West Virginia consumers with their deceptive marketing and deliberately caused the distribution of a defective and harmful product into the West Virginia market.

48.     This deception would not have been possible without Bosch's active participation and assistance. Bosch worked with FCA and Fiat to design the defeat devices for the EcoDiesel® engine system for Jeep Grand Cherokee and Dodge Ram 1500 vehicles that it knew would be marketed to consumers throughout the United States, including West Virginia.

49.     Defendants are also subject to general jurisdiction. FCA and Fiat conduct a substantial amount of business in this District and throughout the state, including the distribution, advertising, sale, lease, and/or warranty of Fiat Chrysler vehicles and their component parts. FCA and Fiat have purposefully availed themselves of this forum by directing their agents and distributors to transact business in this District and throughout West Virginia. Moreover, pursuant to the RICO statute, 18 U.S.C. § 1965, personal jurisdiction over one conspirator is sufficient to provide personal jurisdiction over all co-conspirators. While Plaintiffs contend that there are independent bases for personal jurisdiction in this forum over each Defendant, to the degree that personal jurisdiction is only found over certain Defendants, their participation in a RICO conspiracy grants personal jurisdiction over the remaining Defendants as well.

50.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred in this District. Fiat Chrysler has marketed, warranted, sold, and leased the Class Vehicles, and Defendants otherwise conducted extensive business within this District. Plaintiffs and hundreds or thousands of Class members purchased their Class Vehicles from among the multiple Fiat Chrysler dealers located in this District. Relevant documents and witnesses may be found in this Northern District and throughout West Virginia.

## VI.    FACTS COMMON TO ALL COUNTS

### A.    The Defeat Device Scheme

51.     On January 12, 2017, the EPA and CARB announced to the world that Fiat Chrysler had violated the Clean Air Act in an attempt to reap profits at the expense of the air we breathe and the confidence of its own consumers.

52.     The EPA's Notice of Violation of the Clean Air Act alleges that FCA installed and failed to disclose engine management software in light-duty model year 2014, 2015 and

2016 Jeep Grand Cherokees and Ram 1500 trucks with 3.0-liter diesel engines sold in the United States. The undisclosed software is designed to cloak the impermissibly high NOx emissions produced in normal driving conditions for the purpose of cheating emissions tests

53.    In announcing the Notice of Violation, Cynthia Giles, Assistant Administrator for EPA's Office of Enforcement and Compliance Assurance, said: "Failing to disclose software that affects emissions in a vehicle's engine is a serious violation of the law, which can result in harmful pollution in the air we breathe."[4] She further noted that the EPA will "investigate the nature and impact of these devices. All automakers must play by the same rules, and we will continue to hold companies accountable that gain an unfair and illegal competitive advantage."[5]

54.    Through its own testing at the National Vehicle and Fuel Emissions Laboratory, the EPA discovered eight undisclosed AECDs. These devices were not disclosed to regulators in FCA's applications for Certificates of Conformity (COCs), which designate approved vehicles for sale in the United States. Defendants knew disclosure was required under applicable regulations, yet failed to disclose the presence of these devices in the Class Vehicles.

55.    The mere presence of undisclosed AECDs leaves Fiat Chrysler in violation of Section 203(a)(1) of the Clean Air Act, 42 U.S.C. § 7522(a)(1), with additional violations accruing each time an offending vehicle is sold, offered for sale, introduced into commerce, or delivered/imported for introduction into commerce.

56.    Over 100,000 vehicles on the roads of the United States are affected by Defendants' unlawful and deceitful conduct.

---

[4] *EPA Notifies Fiat Chrysler of Clean Air Act Violations*, EPA (Jan. 12, 2017),
   https://www.epa.gov/newsreleases/epa-notifies-fiat-chrysler-clean-air-act-violations.
[5] *Id.*

57.     EPA testing indicates that at least some of these devices "appear to cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emissions standards," as opposed to during "normal operation and use."[6] This is the purpose of a defeat device, which enables a vehicle to pass lab certification tests and conceal the actual emission levels emitted in actual driving conditions.

58.     In the aftermath of Volkswagen's strikingly similar emissions scandal, the EPA announced on September 25, 2015 that it would conduct additional testing of vehicles on the market "using driving cycles and conditions that may reasonably be expected to be encountered in normal operation and use, for purposes of investigating a potential defeat device."[7] This testing led to the discovery of Defendants' own nefarious conduct.

59.     The EPA's Notice of Violation notes that, despite having the opportunity to do so, Fiat Chrysler has failed to show that it did not know, or should not have known, that the "principal effect of one or more of these AECDs was to bypass, defeat, or render inoperative one or more elements of design installed to comply with emissions standards under the [Clean Air Act.]"[8]

60.     The same day, CARB publicly announced that it, too, has issued a Notice of Violation to FCA after detecting the AECDs in Fiat Chrysler's 2014, 2015, and 2016 Jeep Grand Cherokee and Ram 1500 EcoDiesel® vehicles.  The AECDs were discovered after CARB

---

[6] Keith Laing and Michael Waylan, EPA accuses Fiat Chrysler of emissions cheating, DETROIT NEWS (Jan. 12, 2017), http://www.detroitnews.com/story/business/autos/chrysler/2017/01/12/fiat-chrysler-diesel-emissions/96485778/.

[7] Micheline Maynard, *In VW's Wake, the EPA Gets Tough with Carmakers*, FORBES (Sep. 25, 2015), http://www.forbes.com/sites/michelinemaynard/2015/09/25/in-vws-wake-the-epa-gets-tough-with-carmakers/#6d6217cb6a81.

[8] *Notice of Violation for Model Year 2014-2016 diesel light-duty vehicles (Dodge Ram and Jeep Grand Cherokee)*, EPA (Jan. 12, 2017), https://www.epa.gov/sites/production/files/2017-01/documents/fca-caa-nov-2017-01-12.pdf.

conducted its own independent testing.  CARB also said the company failed to disclose the devices, which it said can significantly increase NOx emissions when activated.

61.    Fiat also found itself in trouble with German regulators. In the wake of the Volkswagen scandal, Germany's KBA tested the emissions of numerous diesel vehicles, including Fiat's. The probe suggested that the emissions controls in certain Fiat diesel models were disabled if the vehicle ran for longer than 22 minutes, causing the cars to emit unlawfully-high levels of exhaust. The finding showed that the vehicles were designed to cheat on emissions tests, which normally run for about 20 minutes.[9] As a result, the KBA's transport minister announced, "We will need to carry out further tests on Fiat models."[10]

62.    After the announcement, reports circulated widely that Bosch had confirmed that certain Fiat vehicles were cheating emissions testing. According to a report in the German publication *Sueddeutsche Zeitung*, Bosch told authorities that its software made for Fiat was being used in the Fiat vehicles in order to illegally evade diesel emissions regulations.[11] *Reuters*, citing the German publication *Bild am Sonntag*, reported that Bosch informed German investigators that Fiat diesel vehicles contain a device that virtually disables exhaust filters.[12] According to the *Reuters* report, the software uses a timer to sense when the test cycle is over, at

---

[9] *Test of Fiat diesel model shows irregular emissions: Bild am Sonntag*, REUTERS (Apr. 24, 2016), http://www.reuters.com/article/us-fiat-emissions-germany-idUSKCN0XL0MT.

[10] David Tracy, *Here's How Fiat Might also be Cheating on Emissions Tests: Report,* JALOPNIK (Apr. 25, 2016), http://jalopnik.com/heres-how-fiat-might-also-be-cheating-on-emissions-test-1772948181.

[11] *Sueddeutsche Zeitung*, Apr. 22, 2016, "Fiat Is Next to be Accused."

[12] *Test of Fiat diesel model shows irregular emissions: Bild am Sonntag*, REUTERS (Apr. 24, 2016), http://www.reuters.com/article/us-fiat-emissions-germany-idUSKCN0XL0MT.

which point it disables emissions controls.[13] Bosch confirmed that it has discussed the issue with

the KBA and is currently cooperating with authorities.[14]

63.     Fiat, however, was uncooperative, refusing to attend a subsequent meeting with

the KBA. Fiat's snub caused the KBA's transport minister to charge: "This uncooperative

behavior of Fiat is completely incomprehensible."[15] He added that "there were concrete

allegations about irregular emissions of Fiat cars."[16]. The KBA's outrage is understandable,

given that Bosch had admitted to creating the defeat devices used in "Family B" model Fiat

vehicles.

64.     Defendants' fraudulent scheme was motivated by the desire to expand market

share in the United States by adding diesel engines to FCA's light truck and SUV lineup. Dodge

and Ram were already well known for their medium-duty trucks equipped with large 8-cylinder

engines supplied by Cummins.[17] Unlike in Europe, where diesel engines in economy cars and

small commercial vehicles have long been popular, diesel engines were stigmatized in the United

States. Many consumers perceived diesel engines as emitting thick smoke and dangerous

pollutants, based on earlier engines of the 1980s and early 1990s. Successful as they were,

Dodge and Ram Cummins-equipped medium-duty trucks contributed to this perception in a

certain way: a community of enthusiasts has grown around "rolling coal"—that is, modifying the

vehicles' emissions systems to belch black clouds of smoke and particulates.

---

[13] David Tracy, *Here's How Fiat Might also be Cheating on Emissions Tests: Report,* JALOPNIK (Apr. 25, 2016), http://jalopnik.com/heres-how-fiat-might-also-be-cheating-on-emissions-test-1772948181.

[14] *Sueddeutsche Zeitung*, Apr. 22, 2016, "Fiat Is Next to be Accused."

[15] *Fiat backed by Italy in snub of Germany over emissions probe*, AUTOMOTIVE NEWS (May 20, 2016), http://www.autonews.com/article/20160520032214/COPY01/305209962

[16] *Id.*

[17] Ram Trucks became a separate brand from Dodge, rather than a Dodge model name, only after Fiat's acquisition.

65.     However, other manufacturers—most notably, Volkswagen—had begun selling smaller, more economical vehicles in the U.S. with diesel engines as environmentally friendly, fuel-efficient alternatives to hybrids and other economical vehicles. Like Volkswagen, Fiat had considerable expertise with diesel engines in Europe, primarily through its subsidiary VM Motori, a leading supplier of diesel engines.

66.     The engine at issue—now known as the "EcoDiesel®," a 3.0-liter, six-cylinder turbodiesel—had been under development before Fiat acquired VM Motori. [18]

67.     After acquiring a 50% stake in VM Motori, Defendants set about integrating a 3.0-liter, six-cylinder V.M. Motori turbodiesel engine into FCA's popular Ram 1500 pickup and the Jeep Grand Cherokee SUV, purportedly offering the benefits of diesel performance and fuel economy to a market quite distinct from those who bought heavy-duty, Cummins-equipped Ram 2500 and 3500 trucks.

68.     As Ram Trucks' Chief Engineer said at the time, "We were fortunate at this point in time that our partners at Fiat owned half of VM Motori, who makes this diesel engine. …We combined resources and developed them together." [19]

69.     On information and belief, because the engine had originally been developed for use in Europe, where standards for emission of oxides of nitrogen from diesel vehicles are less stringent, FCA found it necessary to utilize a defeat device in order to certify the engine to U.S. emissions standards.

70.     The modern type of smaller, turbocharged, direct-injected diesel engines, like Volkswagen's "Clean Diesel" TDI and Fiat Chrysler's EcoDiesel® engines, offer several

---

[18] *An Inside Look at the Ram 1500 3.0L EcoDiesel*, ENGINE LABS (Jan. 11, 2015), http://www.enginelabs.com/engine-tech/an-inside-look-at-the-ram-1500-3-0l-ecodiesel/.
[19] *Id.*

benefits that maximize the potential of diesel fuel. Turbochargers force air into the combustion chambers, creating higher compression, enhancing the efficiency with which power is extracted from the fuel. Direct fuel injection allows a sophisticated engine management computer to precisely manage the air-fuel mixture at all times to maximize power and efficiency.

71.    The EcoDiesel® option, however, is not cheap for environmentally-conscious consumers. For example, the feature is only available on the three most expensive 2014 Grand Cherokee models and adds $4,500 to those vehicles' overall price.[20] The EcoDiesel® option on the 2015 Ram 1500 adds between $3,120 and $4,960.[21]

72.    In addition to the dollars-and-cents costs, diesel still comes with an environmental concession: high emissions of particulates and oxides of nitrogen. $NO_X$ is a hazardous pollutant that contributes to the formation of ground-level ozone, a greenhouse gas that can travel hundreds of miles from the source of emission. Ozone is a colorless and odorless gas that, even at low levels, can cause cardiovascular and respiratory health problems, including chest pain, coughing, throat irritation, and congestion. The human health concerns from over-exposure to $NO_X$ are well established, and include negative effects on the respiratory system, damage to lung tissue, and premature death. $NO_X$ can penetrate deeply into sensitive parts of the lungs, and is known to cause or worsen respiratory diseases like asthma, emphysema, and bronchitis, as well as to aggravate existing heart disease. Children, the elderly, people with lung diseases such as asthma, and people who work or exercise outside are particularly susceptible to such adverse health effects, though the impact of NOx is borne by all of society.

---

[20] *2014 Jeep Grand Cherokee EcoDiesel® V-6*, CAR AND DRIVER (Feb. 2013), http://www.caranddriver.com/reviews/2014-jeep-grand-cherokee-ecodiesel-v-6-first-drive-review.

[21] *2015 Ram 1500 EcoDiesel® 4x4*, CAR AND DRIVER (Aug. 2015) http://www.caranddriver.com/reviews/2015-ram-1500-4x4-ecodiesel-4x4-test-review (last visited Jan. 14, 2017).

73.     Given the dangers of NOx, technology offers a solution. Modern turbodiesel engines use ceramic diesel filters to trap particulates before they are emitted. Many also use a technology called "selective catalytic reduction" ("SCR") to reduce NOx emissions. SCR systems inject a measured amount of urea solution into the exhaust stream, which breaks oxides of nitrogen down into to less noxious substances before they are emitted. SCR-equipped vehicles must carry an onboard tank of fluid for this purpose, and injection of the fluid is controlled by the same engine control module that manages the fuel-air mixture and other aspects of engine operation.

74.     The Class Vehicles use engine management computers to monitor sensors throughout the vehicle and operate nearly all of the vehicle's systems according to sophisticated programming that can sense and vary factors like steering, combustion, and emissions performance for different driving situations. The computer that manages these systems in the Class Vehicles is an "electronic diesel control" or "EDC."

75.     Bosch developed, tested, and manufactured the EDC system used in the Class Vehicles, which is formally referred to as the Electronic Diesel Control Unit 17 (also known as "EDC Unit 17," "EDC 17," and "EDC17").

76.     In a February 28, 2006, press release, Bosch introduced the "New Bosch EDC17 engine management system" as the "brain of diesel injection" which "controls every parameter that is important for effective, low-emission combustion." [22] Bosch made clear that the EDC17's "[e]ffective control of combustion" was not one-size-fits-all; rather, it was a "[c]oncept tailored for all vehicle classes and markets." [23] In the press release, Bosch touted the EDC17 as follows:

---

[22] *The brain of diesel injection: New Bosch EDC17 engine management system*, BOSCH (Feb. 28, 2016), http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.
[23] *Id.*

**EDC17: Ready for future demands**
Because the computing power and functional scope of the new
EDC17 can be adapted to match particular requirements, it can be
used very flexibly in any vehicle segment on all the world's
markets. In addition to controlling the precise timing and quantity
of injection, exhaust gas recirculation, and manifold pressure
regulation, it also offers a large number of options such as the
control of particulate filters or systems for reducing nitrogen
oxides. The Bosch EDC17 determines the injection parameters for
each cylinder, making specific adaptations if necessary. This
improves the precision of the injection throughout the vehicle's
entire service life. The system therefore makes an important
contribution to observing future exhaust gas emission limits.[24]

77.    In January 2013, Bosch officially announced that its "clean diesel" technology,

including the EDC Unit 17, would be featured in the new 2014 Jeep Grand Cherokee 3.0-Liter

EcoDiesel.[25] As part of that announcement, Bosch stated: "The 2014 Jeep Grand Cherokee

features a Bosch emission system compliant with the most stringent emission regulations in the

world. From fuel tank to tailpipe, Bosch is pleased to equip this vehicle with top technologies to

give consumers a great driving experience requiring fewer stops at the pump."[26] Bosch also

announced that the clean diesel system for the Jeep Grand Cherokee would be assembled at

Bosch's facility in Kentwood, Michigan.

78.    According to a number of media reports and Bosch's own public admissions,

Bosch's EDC Unit 17 was widely used throughout the automotive industry, including, most

notably, by Volkswagen.[27] Bosch and Volkswagen worked together to develop and implement a

---

[24] *Id.*

[25] *Bosch Announces Clean Diesel Technology On 2014 Jeep Grand Cherokee*, PRNEWSWIRE
(Jan. 24, 2013), http://www.prnewswire.com/news-releases/bosch-announces-clean-diesel-
technology-on-2014-jeep-grand-cherokee-188243051.html.

[26] *Id.*

[27] *See, e.g.,* Reuters, *Lawyers Say Bosch Worked 'Hand-in-Glove' with VW in Emissions,*
FORTUNE (Aug. 19, 2016), http://fortune.com/2016/08/19/bosch-vw-diesel-emissions-fraud/;
Tom Schoenberg & Alan Katz, *U.S. Is Investigating Bosch in Widening VW Diesel-Cheat
Scandal*, BLOOMBERG TECHNOLOGY (Sep. 16, 2016),

specific set of software algorithms which were incorporated into the EDC Unit 17 of numerous 2.0-Liter and 3.0-Liter Volkswagen, Audi, and Porsche vehicles.[28] In 2016 and 2017, Volkswagen and Bosch agreed to settle all claims regarding the impacted vehicles, which resulted in the largest auto-related class action settlement in U.S. history.[29] Unfortunately, Bosch's role in the emissions cheating scandal did not stop with Volkswagen vehicles.

79.     Bosch's EDC Unit 17 consists of software programming on the EDC Unit 17 capable of detecting when the Class Vehicles are undergoing emissions testing through certain sensor inputs that monitor vehicle speed, engine operation, steering wheel positioning, and the like. This type of defeat device has been termed a "cycle detection defeat device" because it detects when a vehicle is being tested and then operates the engine and emissions controls in such a way that the vehicles pass emissions testing. Because the measures required to pass emissions testing resulted in some combination of traits that would be undesirable in normal operation—such as greater fuel consumption, lower performance, or unsustainable consumption of the urea solution used in SCR—the Defendants ensured that at all other times, the Class Vehicles operated in a manner that polluted many times more than the legal emissions limits.

---

https://www.bloomberg.com/news/articles/2016-09-16/vw-diesel-cheat-probe-widens-as-u-s-said-to-investigate-bosch; Patrick McGee, *Bosch reaches $328m settlement in VW emissions scandal*, FINANCIAL TIMES (Feb. 1, 2017); William Boston, *Lawyers in Volkswagen Case Steer Toward Bosch*, THE WALL STREET JOURNAL (Aug. 18, 2016), https://www.wsj.com/articles/lawyers-in-volkswagen-case-steer-toward-bosch-1471553504 ; Patrick McGee, *Bosch products under scrutiny in VW emissions scandal*, FINANCIAL TIMES (Oct. 4, 2016); Reuters, *VW and Bosch Agree to $1.6 Billion Settlements for Car Owners Over Diesel Scandal*, FORTUNE (Feb. 1, 2017), http://fortune.com/2017/02/01/vw-robert-bosch-diesel-settlement/.

[28] *Id.*

[29] *Id.*

80.     Customizing a road-ready ECU is a time intensive endeavor which required Bosch and Fiat Chrysler to work hand-in-glove to modify the software, and to create specifications for each of the Class Vehicles.

81.     All Bosch ECUs, including the EDC Unit 17, run on complex, highly proprietary engine management software over which Bosch exerts control. In fact, according to one car-company engineer, the software is typically locked to prevent customers, like Fiat Chrysler, from making significant changes on their own.[30]

82.     Specifically, the engineer explained, speaking to the media on the condition of anonymity:

> I've had many arguments with Bosch, and they certainly own the dataset software and let their customers tune the curves. Before each dataset is released it goes back to Bosch for its own validation.
>
> Bosch is involved in all the development we ever do. They insist on being present at all our physical tests and they log all their own data, so someone somewhere at Bosch will have known what was going on.
>
> All the software routines have to go through the software verification of Bosch, and they have hundreds of milestones of verification, that's the structure . . . .
>
> The car company is *never* entitled by Bosch to do something on their own.[31]

83.     Therefore, Bosch cannot show that the development of the "defeat device" in the Class Vehicles was solely the work of Fiat Chrysler, and has told regulators that it is not relying on a "black box" defense.

---

[30] Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, CAR AND DRIVER (Nov. 23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheatersoftware/.
[31] *Id.*

**B.    Applicable Emissions Standards & Testing**

84.    When a manufacturer wishes to introduce a new car in the U.S. market, it must obtain a COC from the EPA, by showing that the vehicle comports with the requirements of the Clean Air Act, 42 USC § 7522 and 40 CFR 86.1843-01.

85.    As part of that certification process, the manufacturer must disclose any AECDs that are included in the vehicle. AECDs are "any element of design which senses temperature, vehicle speed…or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." 40 CFR 86.1803-01. All vehicles have AECDs, and there is nothing per se illegal about modulating the operation of emissions control systems. However, in applying for a COC, the manufacturer must list all AECDs in the vehicles, and then justify why they are not defeat devices. 40 CFR 86.1844-01(d)(11). Thus, Defendants' willful omission violates the CAA.

86.    40 CFR 86.1803-01 provides that: "Defeat device means an auxiliary emission control device (AECD) that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless:

> **(1) Such conditions are substantially included in the Federal emission test procedure;**
>
> **(2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident; or**
>
> **(3) The AECD does not go beyond the requirements of engine starting."[32]**

---

[32] 40 CFR 86.1803-01 (emphasis added).

87. Here, because the Class Vehicles are equipped with a Defeat Device and passed emissions testing only by cheating, they should never have received COCs that rendered them legal to sell in the U.S.

88. Plaintiffs' counsel has retained experts to analyze and test the subject vehicles, and on-road tests of Class Vehicles show that the FCA EcoDiesel® produces NOx emissions well above U.S. federal and state legal limits.

89. A 2014 Ram 1500 equipped with a 3.0L EcoDiesel® engine and featuring selective catalytic reduction (SCR) NOx after-treatment technology was tested on a chassis dynamometer as well as on the road. In both scenarios, gaseous exhaust emissions, including oxides of nitrogen (NOx), nitrogen oxide (NO), carbon monoxide (CO), carbon dioxide ($CO_2$), and total hydrocarbons (THC) were measured on a continuous basis using a portable emissions measurement system (PEMS) from Horiba®.

90. The tests showed significantly increased NOx emissions during on-road testing as opposed to testing on a chassis dynamometer (i.e., in the laboratory). On the road, over an urban/suburban route, the vehicle produced average NOx emissions that exceeded federal certification standards by approximately 15-19 times. When tested on a highway, the average NOx emissions measured *35 times* the EPA Tier 2/Bin 5 standard.

**C.    Defendants Marketed the Class Vehicles as Environmentally Friendly, Emissions-Compliant, Fuel-Efficient, and Reliable**

91. FCA's EcoDiesel® vehicles are aggressively marketed as offering a combination of power, efficiency, and environmental cleanliness that competitors cannot match: the Class Vehicles' "exhaust is ultra-clean" due to their "advanced emissions-control technology."[33]

---

[33] *Chrysler Group LLC, Chrysler Group's 3.0-liter EcoDiesel V-6, 500e Battery-Electric Drive System Among Ward's 10 Best Engines for 2014*, PRNEWSWIRE (Dec. 12, 2013).

Specifically, the "emissions control system helps ensure that virtually no particulates and minimal [NOx] exit the tailpipe."[34]

92.    The Class Vehicles are also represented to be emission-compliant in all 50 states (see image below, featuring the slogan "love the planet along with great fuel economy?").[35] That claim is bolstered by the inclusion of an Emissions Warranty guaranteeing compliance with applicable emissions regulations, which Defendants placed in the owner's manuals of Class Vehicles.

---

[34] Dale Jewett, *EcoDiesel: An Essential Tool for Every Outdoorsman*, FCA NORTH AMERICA (May 22, 2015), https://blog.fcanorthamerica.com/2015/05/22/ecodiesel-an-essential-tool-for-every-outdoorsman/.

[35] *2015 Grand Cherokee Brochure*, JEEP, http://www.slideshare.net/seaviewjeep1/2015-jeep-grand-cherokee-brochure (last visited Feb. 8, 2017).



93.    Fiat Chrysler represented Class Vehicles as offering excellent fuel economy: greater than a comparable gasoline engine and offering a range of 730 miles on a single tank of diesel fuel, and "the best fuel economy of any full-size pickup" (examples below).





94.    FCA's website even offers calculators purporting to show how much fuel, time and money consumers could save. For example:



95.    But unbeknownst to those consumers—consumers who Fiat Chrysler identified as wanting an efficient, environmentally-friendly truck without sacrificing capability or performance—Defendants could only achieve those impressive results by cheating on emissions testing. Moreover, in normal driving, the vehicles polluted much more than advertised or permissible by applicable laws.

96.    Finally, Defendants advertised the vehicles as "long-lasting" and "reliable" but to the extent that the vehicles need a "fix" or repair to comply with emissions laws these advertisements are false and misleading.[36]

---

[36] *2017 Ram Trucks*, RAM
https://www.ramtrucks.com/assets/pdf/brochures/2017_Ram_Retail_Brand_Saver.pdf (last visited Feb. 8, 2017).



## VII.   CLASS ACTION ALLEGATIONS

97.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant

to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on

behalf of the following Class:

**Nationwide Class**

All persons or entities in the United States who are current or former owners
and/or lessees of an FCA "Class Vehicle." Class Vehicles include, without
limitation, all FCA EcoDiesel® vehicles equipped with selective catalytic
reduction ("SCR") to control NOx emissions, including but not limited to the
2014-2016 Ram 1500 and the 2014-2016 Jeep Grand Cherokee.

98.     Additionally, Plaintiffs seek to represent the following statewide Classes:

**West Virginia Class**

All persons or entities in the State of West Virginia who are current or former owners and/or lessees of an FCA "Class Vehicle." Class Vehicles include, without limitation, all FCA EcoDiesel® vehicles equipped with selective catalytic reduction ("SCR") to control NOx emissions, including but not limited to the 2014-2016 Ram 1500 and the 2014-2016 Jeep Grand Cherokee.

**North Carolina Class**

All persons or entities in the State of North Carolina who are current or former owners and/or lessees of an FCA "Class Vehicle." Class Vehicles include, without limitation, all FCA EcoDiesel® vehicles equipped with selective catalytic reduction ("SCR") to control NOx emissions, including but not limited to the 2014-2016 Ram 1500 and the 2014-2016 Jeep Grand Cherokee.

99.    In the alternative to the Nationwide Class, and pursuant to Federal Rules of Civil Procedure Rule 23(c)(5), Plaintiffs seek to represent the following National Subclasses (hereinafter, together with the West Virginia Class and North Carolina Class, "Subclasses") as well as any subclasses or issue classes as Plaintiffs may propose and/or the Court may designate at the time of class certification:

**Current Owners and Lessees**:

All persons or entities that currently own and/or lease a Class Vehicle.

**Former Owners and Lessees**:

All persons or entities that purchased and/or leased a Class Vehicle, but who no longer hold title to such a Vehicle.

100.    Excluded from the Class are individuals who have personal injury claims resulting from the "defeat device." Also excluded from the Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

33

101.    Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

102.    This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

103.    Plaintiffs reserve the right to modify and/or add to the Nationwide and/or West Virginia and North Carolina Classes prior to class certification.

104.    The term "Class" may generally refer to any and all classes certified by the Court, including the Nationwide Class, the West Virginia Class, North Carolina Class, and/or any and all designated Subclasses.

**A.      Numerosity: Federal Rule of Civil Procedure 23(a)(1)**

105.    The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believes that there are not fewer than 100,000 members of the Class, the precise number of Class members is unknown to Plaintiffs, but it may be ascertained from Defendants' records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

**B.      Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**

106.    This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

(a)      Whether Defendants engaged in the conduct alleged herein;

(b)      Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

(c)      Whether the emissions control system in the Class Vehicles contains a defect in that it does not comply with EPA requirements;

(d)      Whether the emissions control systems in Class Vehicles can be made to comply with EPA standards without substantially degrading the performance of the Class Vehicles;

(e)      Whether Defendants knew about the defeat device and, if so, how long Defendants have known;

(f)      Whether Defendants designed, manufactured, marketed, and distributed Class Vehicles with a "defeat device;"

(g)      Whether Defendants' conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

(h)      Whether Plaintiffs and the other Class members overpaid for their Class Vehicles;

(i)      Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief;

(j)      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount; and

(k)      Whether Defendants continue to unlawfully conceal and misrepresent whether additional vehicles, besides those reported in the press to date, are in fact Class Vehicles.

## C.    Typicality: Federal Rule of Civil Procedure 23(a)(3)

107.    Plaintiffs' claims are typical of the claims of the Class members whom he seeks to represent under Fed. R. Civ. P. 23(a)(3), because Plaintiffs and each Class Member purchased an Affected Vehicle and were comparably injured through Defendants' wrongful conduct as

described above. Neither Plaintiffs nor the other Class members would have purchased the Class Vehicles had they known of the defects in the vehicles. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

### D.    Adequacy: Federal Rule of Civil Procedure 23(a)(4)

108.    Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests do not conflict with the interests of the Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including vehicle defect litigation and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel has interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

### E.    Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)

109.    Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

### F.    Superiority: Federal Rule of Civil Procedure 23(b)(3)

110.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would

be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct.

111.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.   ANY APPLICABLE STATUES OF LIMITATION ARE TOLLED

112.    The tolling doctrine was made for cases of concealment like this one. For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

113.    Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered that Defendants were concealing and misrepresenting the true emissions levels of their vehicles, including but not limited to their use of defeat devices.

114.    Plaintiffs and the other Class members could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect, or that Defendants had intentionally failed to report information within their knowledge to federal and state authorities, dealerships, or consumers, until shortly before this action was filed.

115.    Likewise, a reasonable and diligent investigation could not have disclosed that Defendants had information in their possession about the existence of its sophisticated emissions deception and that they concealed that information, which was only discovered by Plaintiffs shortly before this action was filed.

## A.  Tolling Due To Fraudulent Concealment

116.  Throughout the relevant time period, all applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

117.  Upon information and belief, prior to the date of this Complaint, if not earlier, Defendants knew of the defeat device in the Class Vehicles, but continued to distribute, sell, and/or lease the Class Vehicles to Plaintiffs and the Class members. In doing so, Defendants concealed and expressly denied the existence of problem with NOx emissions, and/or failed to notify Plaintiffs and the Class members about the true nature of the Class Vehicles.

118.  Instead of disclosing their deception, or that the emissions from the Class Vehicles were far worse than represented, Defendants falsely represented that its vehicles complied with federal and state emissions standards, and that they were reputable manufacturers whose representations could be trusted.

## B.  Estoppel

119.  Defendants have a continuous and ongoing duty to tell the truth about their products and to disclose to Plaintiffs and the other Class members the facts that they knew about the emissions from Class Vehicles, and of those vehicles' failure to comply with federal and state laws.

120.  Although they had the duty throughout the relevant period to disclose to Plaintiffs and Class members that they had engaged in the deception described in this Complaint, Defendants chose to evade federal and state emissions and clean air standards with respect to the Class Vehicles, and intentionally misrepresented their blatant and deceptive lack of compliance with federal and state law regulating vehicle emissions and clean air.

38

121.    Defendants actively concealed the true character, quality, performance, and nature of the defeat device in the Class Vehicles, and Plaintiffs and the Class members reasonably relied upon Defendants' knowing and active concealment of these facts.

122.    Thus, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## IX.    CAUSES OF ACTION

### A.    Claims Asserted on Behalf of all Classes

#### COUNT I
#### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
#### Violation of 18 U.S.C. § 1962(c)-(d)

123.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

124.    Plaintiffs bring this Count on behalf of themselves, the Nationwide Class, and all Subclasses.

125.    At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

126.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

127.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

128.    In order to compete with vehicle manufacturers like Volkswagen (which introduced a line of "environmentally friendly" diesel engine vehicles in the United States) and increase their market share, Fiat Chrysler, in conjunction with Bosch, sought to add diesel

engines to FCA's light truck and SUV lineup. But, due to the strict emissions control requirements imposed by U.S. law and the standards of U.S. consumers, Fiat Chrysler found it impossible to achieve its goals lawfully, and instead resorted to cheating through a fraudulent scheme and conspiracy. The illegal scheme was hatched and developed by Fiat and Bosch GmbH, furthered through correspondence between Defendants in Germany and the U.S., and executed in the U.S. through the vehicles of FCA, in conjunction with General Motors and Fiat's subsidiary companies overseas, including VM Motori.

129.     Specifically, Defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of a RICO enterprise (defined below and referred to collectively as the "Defeat Device RICO Enterprise"), whose purpose was to deceive regulators and the driving public into believing that the Class Vehicles were compliant with emission standards, clean, fuel efficient and environmentally friendly so as to increase revenues and minimize losses from the design, manufacture, distribution and sale of the Class Vehicles and the defeat devices installed therein. As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendants were able to extract billions of dollars from sales made to Plaintiffs and the Class. As explained in detail below, Defendants' years-long misconduct violated Sections 1962(c) and (d).

### a.     Description of the Defeat Device RICO Enterprise

130.     In an effort to expand its global reach, market share, and sales in the U.S., Italian automaker Fiat (then controlled by an Italian holding company) acquired American automaker Chrysler. Previously, Chrysler was owned by Germany's Daimler-Benz AG, which sold Chrysler in 2007 and fully divested in 2009. Fiat's acquisition of Chrysler occurred gradually over a period of years, between 2009 and 2014, and resulted in the creation of FCA US LLC. All Fiat

assets, including both FCA US and FCA Italy and their respective subsidiaries, were merged in

2014 into Fiat Chrysler Automobiles N.V., a new Dutch holding company.

131.    At all relevant times, Fiat Chrysler maintained tight control over the design,

manufacture, and testing of the Class Vehicles. Fiat Chrysler's business operations in the United

States include, for example, the manufacture, distribution, and sale of motor vehicles and parts

through their network of independent, franchised motor vehicle dealers. Bosch similarly exerts

control over access to the proprietary engine control software it supplied to Fiat Chrysler. At all

relevant times, Defendants, along with other individuals and entities, including unknown or

additional third parties involved in the design, manufacture, testing, and sale of the Class

Vehicles, operated an association-in-fact enterprise, which was formed for the purpose of

fraudulently obtaining COCs from the Environmental Protection Agency (and executive orders

from CARB) in order to sell Class Vehicles containing defeat device(s) throughout the U.S., and

through which they conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4).

132.    Specifically, Fiat and/or FCA are the entities that applied for, and obtained, the

EPA COC for the Fiat-Chrysler branded Class Vehicles with material misrepresentations and

omissions about their specifications in order to introduce them into the U.S. stream of commerce.

133.    Fiat Chrysler used its network of independent, franchised motor vehicle dealers to

distribute and sell the illegal Class Vehicles throughout the U.S.

134.    General Motors and VM Motori participated, either directly or indirectly, in the

conduct of the enterprise's affairs by developing, testing, and/or supplying V6 diesel engines

which contained and concealed unlawful defeat device(s) to Defendants.

135. General Motors and VM Motori began development of this engine before its acquisition by Fiat.[37] Fiat acquired half of VM Motori in 2011, and completed its acquisition only in late 2013, after the engine and the Class Vehicles had been developed, certified by the EPA, and put on sale in the United States.[38]

136. The separate legal statuses of Defendants, General Motors, and VM Motori facilitated the fraudulent scheme and attempted to provide a shield from liability for Defendants and their co-conspirators.

137. Alternatively, Defendants, their subsidiaries, and their directors, officers, and engineers constitute a single "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which Defendants conducted their pattern of racketeering activity in the U.S. The enterprises, alleged in this and the previous paragraphs, are referred to collectively as the "Defeat Device RICO Enterprise."

138. At all relevant times, the Defeat Device RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in Defendants' profit-making scheme.

139. Finally, Bosch participated, either directly or indirectly, in the conduct of the enterprise's affairs by developing, supply, and concealing the defeat devices. Bosch's participation was a necessary part of the enterprise.

---

[37] *Fiat-Chrysler 3.0L Diesel V6 Was Originally a GM Engine*, GM AUTHORITY (July 16, 2013), http://gmauthority.com/blog/2013/07/fiat-chrysler-3-0l-diesel-v6-is-actually-a-gm-engine/.
[38] *Fiat Buys Remainder of Diesel Manufacturer VM Motori From GM*, AUTOMOTIVE NEWS (Oct. 28, 2103), www.autonews.com/article/20131028/OEM10/131029887/fiat-buys-remainder-of-diesel-maker-vm-motori-from-gm.

140.    The association-in-fact Defeat Device RICO Enterprise consisted of the following entities and individuals:

### (i)    The Fiat-Chrysler Entity Defendants

141.    Fiat and its American subsidiary, FCA, working with the other below-described members of the Defeat Device RICO Enterprise, devised a scheme to illegally circumvent the U.S.'s stringent emissions standards by incorporating a "defeat device" into the Class Vehicles' engine management computers.

142.    Employing this technology, Fiat Chrysler fraudulently obtained EPA COC (and CARB executive orders) for the Class Vehicles, even though they emit unlawful levels of toxic pollutants into the atmosphere during normal operating conditions

143.    Moreover, to profit from the scheme and increase their sales, Fiat Chrysler falsely marketed the Class Vehicles as not only compliant but clean, fuel-efficient and environmentally-friendly vehicles.

### (ii)    VM Motori and General Motors

144.    VM Motori S.p.A. ("VM Motori") is a diesel engine manufacturer based in Cento, Italy. In 2011, Fiat purchased a 50% share of the company from Penske Corporation. General Motors controlled the other 50%. Fiat bought the remaining 50% from General Motors in late 2013, after the Class Vehicles and engines had already been developed, certified by the EPA, and offered for sale in the United States.

145.    In 2010 or 2011, VM Motori announced a new product line of a V6, 3.0-liter displacement engines for inclusion in SUVs, trucks, and large sedans. These engines had been under development for use in a General Motors automobile for the European market. [39]

---

[39] *An Inside Look at the Ram 1500 3.0L EcoDiesel*, ENGINE LABS (Jan. 11, 2015), http://www.enginelabs.com/engine-tech/an-inside-look-at-the-ram-1500-3-0l-ecodiesel/

146.    However, further development for use in FCA vehicles took place following Fiat's acquisition of 50% of VM Motori in 2011. As Ram Trucks' Chief Engineer said at the time, "We were fortunate at this point in time that our partners at Fiat owned half of VM Motori, who makes this diesel engine. …We combined resources and developed them together."[40]

147.    According to its website, VM Motori is deeply involved in the development and testing of all aspects of the engine: "We take care of the engines and their applications, working together with the Customers to the least detail to ensure a perfect matching between the engine and the machine, supporting our partners from A to Z, from engine- to-machine coupling up to the production."[41]

148.    In fact, VM Motori makes specific mention of its involvement in: "Calibration development to meet specific vehicle/end user requirements, Exhaust after-treatment system development, [and] Environmental trips (hot/cold climate, high altitude, etc.),"[42] VM Motori also notes that its facilities include: "Rolling dyno for vehicle emission measurement [and] 17 engine test benches for emission/performance development."[43]

149.    During all relevant periods, VM Motori developed and supplied engines for the Class Vehicles that contained, were calibrated to, and/or suppressed the existence of a defeat device, in furtherance of the Defeat Device RICO Enterprise.

### (iii)    The Bosch Defendants

150.    Bosch exerted control over the development of the EDC 17 for use in the Class Vehicles, and actively participated in its development.

---

[40] *Id.*

[41] *Research and Development*, VM MOTORI, http://www.vmmotori.com/r-s/vm-motori/r-s-2.html (last accessed Jan. 13, 2017).

[42] *Id.*

[43] *Id.*

151.    Defendant Bosch GmbH is a multinational engineering and electronics company headquartered in Gerlingen, Germany, which has hundreds of subsidiaries and companies.

152.    Bosch GmbH wholly owns Defendant Bosch LLC, a Delaware limited liability company headquartered in Farmington Hills, Michigan.

153.    As previously explained, Bosch's sectors and divisions are grouped by subject matter, not location. The Mobility Solutions (formerly Automotive Technology) is the Bosch sector at issue, particularly its Diesel Services division, and it encompasses employees of Bosch GmbH and Bosch LLC. Bosch is responsible for the design, manufacture, development, customization, and supply of the defeat device to Fiat Chrysler for use in the Class Vehicles.

154.    Bosch worked closely with Fiat Chrysler to develop and implement a specific and unique set of software algorithms. Bosch customized its EDC 17 for installation in the Class Vehicles with unique software code to detect when it was undergoing emissions testing, a time intensive endeavor which required Bosch and Fiat Chrysler to work hand-in-glove to modify the software.

155.    Bosch exerted control over its proprietary software. According to one car company engineer, typically, Bosch would insist that, by contract, it would have guaranteed ownership over the software's object code, carry out any modifications to its software, and if an automaker customer made any material changes, any such changes would be observed, tested, and subject to the approval of Bosch. [44] As such, Bosch would have been a necessary participant in manipulating the EDC 17.[45]

---

[44] Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, CAR AND DRIVER (Nov. 23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheatersoftware/.
[45] *Id.*

156.    As previously detailed, Bosch admitted to German regulators that it had designed the CPUs and software in Fiat Chrysler's diesel vehicles that were the defeat devices.[46] Specifically, Bosch designed a system for Fiat's European models that could detect a 22 minute testing cycle, and delivered the master data sets to Fiat to "flash" them into the vehicles.

157.    Prior to the detection of the devices, however, Bosch even went further to host press and media events to promote FCA's diesel vehicles to lawmakers and the public.[47] For example, in April 2009, Bosch organized and hosted a two-day "California Diesel Days" event in Sacramento, California. Bosch invited a roster of lawmakers, journalists, executives, regulators, and NGOs with the aim of changing perceptions of diesel from "dirty" to "clean." The participants in the event included: Audi of America, BMW North America, the California Air Resources Board, the California Energy Commission, the Center for Energy Efficiency and Renewable Technologies, Daimler AG, the International Council on Clean Transportation, the Natural Resources Defense Council, Robert Bosch LLC, Volkswagen of America, and Gale Banks Engineering.[48] As part of 'Diesel Days,' Bosch hosted a "Clean Diesel Automaker Roundtable." The roundtable discussion format was "designed to engage California legislators, regulators and other attendees in the discussion about immediate benefits Clean Diesel passenger vehicles offer for reducing vehicle petroleum consumption and $CO_2$ emissions" and "promote

---

[46] *Sueddeutsche Zeitung*, Apr. 22, 2016, "Fiat Is Next to be Accused."

[47] *See*, *e.g.*, *Gale Banks to Moderate Clean Diesel Automaker Roundtable*, BANKSPOWER (Mar. 30, 2009), http://bankspower.com/news/show/36-Gale-Banks-To-Moderate-Clean-Diesel-Automaker-Roundtable; Dale Jewett, *EcoDiesel: An Essential Tool for Every Outdoorsman*, FCA NORTH AMERICA (May 22, 2015), https://blog.fcanorthamerica.com/2015/05/22/ecodiesel-an-essential-tool-for-every-outdoorsman/.

[48] *Gale Banks to Moderate Clean Diesel Automaker Roundtable*, BanksPower (Mar. 30, 2009), http://bankspower.com/news/show/36-Gale-Banks-To-Moderate-Clean-Diesel-Automaker-Roundtable

science- and fact-based dialogue on a level regulatory playing field for near-term technologies

reducing $CO_2$ emissions and increasing fuel economy."

158.    According to media reports, at a similar event hosted by Ram, Jeep and Bosch in

Traverse City, Michigan, Bosch made a number of specific misrepresentations regarding the 3.0-

liter EcoDiesel V-6's performance. Specifically, Bosch represented that "Bosch emissions

control system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx)

exit the tailpipe" and that a Jeep Grand Cherokee or Ram 1500 EcoDiesel engine provides a fuel

economy that is "30% better than a comparable gasoline engine."[49]

### b.    The Defeat Device RICO Enterprise Sought to Increase Defendants' Profits and Revenues

159.    Because the engine had originally been developed for use in Europe, where

standards for emission of oxides of nitrogen from diesel vehicles are less stringent, inclusion of a

defeat device was necessary to certify the engine to U.S. emissions standards and include it in

FCA vehicles.

160.    At all relevant times, the Defeat Device RICO Enterprise: (a) had an existence

separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern

of racketeering in which Defendants engaged; and (c) was an ongoing and continuing

organization consisting of legal entities, including Defendants, their subsidiaries, officers,

executives, and engineers, VM Motori, and other entities and individuals associated for the

common purpose of designing, manufacturing, distributing, testing, and selling the Class

Vehicles to Plaintiffs and the Nationwide Class through fraudulent COC and executive orders,

false emissions tests, deceptive and misleading sales tactics and materials, and deriving profits

---

[49] Dale Jewett, *EcoDiesel: An Essential Tool for Every Outdoorsman*, FCA North America (May 22, 2015), https://blog.fcanorthamerica.com/2015/05/22/ecodiesel-an-essential-tool-for-every-outdoorsman/.

and revenues from those activities. Each member of the Defeat Device RICO Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud Class members nationwide.

161.    The Defeat Device RICO Enterprise functioned by selling vehicles and component parts to the consuming public. Many of these products are legitimate, including vehicles that do not contain defeat devices. However, Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity. The pattern involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Class Vehicles. In particular, Bosch benefitted from increased sales of Class Vehicles as well as increased sales of its EDC 17, software, and other technology to Fiat Chrysler.

162.    The Defeat Device RICO Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Class Vehicles throughout the country and the receipt of monies from the sale of the same.

163.    Within the Defeat Device RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Defeat Device RICO Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Class Vehicles to the general public nationwide.

164.    Each participant in the Defeat Device RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Defeat Device RICO Enterprise, Defendants functioned

as a unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

165.    Defendants participated in the operation and management of the Defeat Device RICO Enterprise by directing its affairs, as described herein. While Defendants participated in, and are members of, the enterprise, they had and have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

166.    Defendants exerted substantial control over the Defeat Device RICO Enterprise, and participated in the affairs of the Defeat Device RICO Enterprise by:

A.    designing the Class Vehicles with defeat devices;

B.    failing to correct or disable the defeat devices;

C.    manufacturing, distributing, and selling the Class Vehicles that emitted greater pollution than allowable under the applicable regulations;

D.    misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and executive order applications;

E.    introducing the Class Vehicles into the stream of U.S. commerce without a valid EPA COC and/or CARB executive order;

F.    concealing the existence of the defeat devices and the unlawfully high emissions from regulators and the public, notwithstanding Defendants' duty to be truthful;

G.    misleading the driving public as to the nature of the defeat devices and the defects in the Class Vehicles;

H.    designing and distributing marketing materials that misrepresented and concealed the defect in the vehicles;

I.      otherwise misrepresenting or concealing the defective nature of the Class Vehicles from the public and regulators;

J.      lobbying U.S. regulators, and other key stakeholders, to enhance the reputations and sales of diesel vehicles;

K.      illegally selling and/or distributing the Class Vehicles;

L.      collecting revenues and profits from the sale of such products; and

M.      ensuring that other Defendants and unnamed co-conspirators complied with the fraudulent scheme.

167.    Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

### c.      Mail and Wire Fraud

168.    To carry out, or attempt to carry out the scheme to defraud, Defendants, each of whom is a person associated-in-fact with the Defeat Device RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the Defeat Device RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

169.    Specifically, Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years. The multiple acts of racketeering activity which Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Defendants' regular

use of the facilities, services, distribution channels, and employees of the Defeat Device RICO

Enterprise. Defendants participated in the scheme to defraud by using mail, telephone, and the

Internet to transmit mailings and wires in interstate or foreign commerce.

170.   Defendants used, directed the use of, and/or caused to be used, thousands of

interstate mail and wire communications in service of their scheme through virtually uniform

misrepresentations, concealments and material omissions.

171.   In devising and executing the illegal scheme, Defendants devised and knowingly

carried out a material scheme and/or artifice to defraud Plaintiffs and the Nationwide Class or to

obtain money from Plaintiffs and the Nationwide Class by means of materially false or

fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of

executing the illegal scheme, Defendants committed these racketeering acts, which number in the

thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

172.   Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are

not limited to:

> Mail Fraud: Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing
> to be sent and/or received, materials via U.S. mail or commercial interstate carriers for
> the purpose of executing the unlawful scheme to design, manufacture, market, and sell
> the Class Vehicles by means of false pretenses, misrepresentations, promises, and
> omissions.

> Wire Fraud: Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or
> by causing to be transmitted and/or received, materials by wire for the purpose of
> executing the unlawful scheme to defraud and obtain money on false pretenses,
> misrepresentations, promises, and omissions.

173.   Defendants' use of the mails and wires include, but are not limited to, the

transmission, delivery, or shipment of the following by Defendants or third parties that were

foreseeably caused to be sent as a result of Defendants' illegal scheme:

> A.   the Class Vehicles themselves;

B.   component parts for the defeat devices;

C.   essential hardware for the Class Vehicles;

D.   falsified emission tests;

E.   fraudulent applications for EPA COCs and CARB executive orders;

F.   fraudulently-obtained EPA COC and CARB executive orders;

G.   vehicle registrations and plates as a result of the fraudulently-obtained EPA COC
     and CARB executive orders;

H.   documents and communications that facilitated the falsified emission tests;

I.   false or misleading communications intended to lull the public and regulators from
     discovering the defeat devices and/or other auxiliary devices;

J.   sales and marketing materials, including advertising, websites, product packaging,
     brochures, and labeling, which misrepresented and concealed the true nature of the
     Class Vehicles;

K.   lobbying materials designed to enhance the status of diesel vehicles, including the
     Class Vehicles, and also to increase sales of such vehicles;

L.   documents intended to facilitate the manufacture and sale of the Class Vehicles,
     including bills of lading, invoices, shipping records, reports and correspondence;

M.   documents to process and receive payment for the Class Vehicles by unsuspecting
     Class members, including invoices and receipts;

N.   payments to VM Motori;

O.   millions of dollars in compensation to Fiat and FCA executives;

P.   deposits of proceeds; and

Q.   other documents and things, including electronic communications.

174.    Defendants used the mail (including email) and/or wire to communicate regarding changes to the EDC Unit 17 in the Class Vehicles intended to improve the overall functionality of the "defeat device."

175.    Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, Defendants, made misrepresentations about the Class Vehicles on their websites, YouTube[50], and through advertisements online, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics.

176.    For example, as pictured below and in numerous examples above, Defendants announced that the EcoDiesel® engine, installed in the Jeep Grand Cherokee is "efficient" and environmentally friendly: "leaving little trace of being there."



177.    Moreover, on information and belief, Defendants used the internet, mails and/or wires to submit documents and messages in support of fraudulent applications for EPA COC and

---

[50] See, e.g., Jeep, *2014 Grand Cherokee – 3.0L EcoDiesel® Engine* (Last Accessed 1/13/17), https://www.youtube.com/watch?v=TMJYIyiBkZk

CARB executive orders, in which Defendants "attested to compliance with" California and federal "emissions standards."[51]

178.    Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

179.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and to lure consumers into purchasing the Class Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign.

180.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

181.    Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market

---

[51] *See, e.g.*, California Environmental Protection Agency Air Resources Board, Executive Order A-009-1264,
https://www.arb.ca.gov/msprog/onroad/cert/pcldtmdv/2014/chrysler_mdv_a0091264_3d0_u2_diesel.pdf.

share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

182.    Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

183.    To achieve their common goals, Defendants hid from the general public the unlawfulness and emission dangers of the Class Vehicles and obfuscated the true nature of the defect

184.    Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Class Vehicles (and the defeat devices contained therein).

185.    Indeed, for the conspiracy to succeed each of Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics—specifically complete secrecy about the defeat devices in the Class Vehicles.

186.    Defendants knew and intended that government regulators, as well as Plaintiffs and Class members, would rely on the material misrepresentations and omissions made by them about the Class Vehicles. Defendants knew and intended that consumers would incur costs as a result. As fully alleged herein, Plaintiffs, along with thousands of other consumers, relied upon Defendants' representations and omissions that were made or caused by them. Plaintiffs' and Class members' reliance is made obvious by the fact that they purchased illegal vehicles that never should have been introduced into the U.S. stream of commerce. In addition, the EPA, CARB, and other regulators relied on the misrepresentations and material omissions made or caused to be made by Defendants.

187.    As described herein, Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and Class members based on their misrepresentations and omissions, while providing Class Vehicles that were worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

188.    The predicate acts all had the purpose of generating significant revenue and profits for Defendants at the expense of Plaintiffs and Class members. The predicate acts were committed or caused to be committed by Defendants through their participation in the Defeat Device RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with remediating the Class Vehicles.

189.    During the design, manufacture, testing, marketing and sale of the Class Vehicles, Defendants used the mail and/or wire to share technical, marketing, and financial information that revealed the existence of the defeat devices contained therein. Nevertheless, Defendants shared and disseminated information that deliberately misrepresented the Class Vehicles as legal, clean, environmentally friendly, and fuel efficient.

190.    By reason of, and as a result of the conduct of Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

A.    Purchase or lease of an illegal, defective Class Vehicle;

B.    Overpayment for a Class Vehicle;

C.      Other out-of-pocket and loss-of-use expenses;

D.      Payment for alternative transportation; and

E.      Loss of employment due to lack of transportation.

191.    Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and Class members, and Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT II**
**FRAUD BY CONCEALMENT**
**(Common Law)**

192.    Plaintiffs reallege and incorporates by reference all paragraphs as though fully set forth herein.

193.    Plaintiffs bring this claim on behalf of themselves, the Nationwide Class, and all Subclasses.

194.    Defendants designed, manufactured, distributed, marketed, sold, and/or leased Class Vehicles to Plaintiffs, the West Virginia Class members and North Carolina Class members. Defendants represented to Plaintiffs and the Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles had no significant defects, complied with EPA and state emissions regulations, and would perform and operate properly when driven in normal usage.

195.    Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Class Vehicles in order to defraud and mislead both regulators and the Class about the true nature of the Class Vehicles. Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose

the defeat devices in the Class Vehicles that caused the vehicles to operate in a low-emission test

mode only during testing.

196.    The Defendants installed software in their vehicles that enabled emissions

controls for nitrogen oxide—a pollutant that contributes to health problems and global

warming—to pass EPA emissions testing while at the same time disabling the same controls

during real-world driving. Specifically, the software was designed to cheat emission testing by

showing lower emissions during laboratory testing conditions then actually existed when the

vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass

emission certification tests through deliberately induced lower-than-real-world emissions

readings. Plaintiffs and Class members reasonably relied upon Defendants' false representations.

They had no way of knowing that Defendants' representations were false and gravely

misleading. As alleged herein, Defendants employed sophisticated methods of deception.

Plaintiffs and Class members did not, and could not, unravel Defendants' deception on their

own.

197.    Defendants concealed and suppressed material facts concerning their true

corporate cultures—cultures characterized by an emphasis on profits and sales above compliance

with federal and state clean air law and emissions regulations that are meant to protect the public

and consumers. They also emphasized profits and sales above the trust that Plaintiffs and Class

members placed in their representations. Consumers buy diesel cars from FCA because they feel

they are clean diesel cars. They do not want to be spewing noxious gases into the environment.

And yet, that is precisely what the Class Vehicles are doing during real-world driving conditions.

198.    Necessarily, Defendants also took steps to ensure that its employees did not reveal

the details of their deception to regulators or consumers, including Plaintiffs and Class members.

Defendants did so in order to boost the reputations of their vehicles and to falsely assure purchasers and lessors of their vehicles, including certified previously owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air and emissions regulations, and that their vehicles likewise comply with applicable laws and regulations

199.   Defendants' false representations were material to consumers, both because they concerned the quality of the Class Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As Defendants well knew, their customers, including Plaintiffs and Class members, highly valued that the vehicles they were purchasing or leasing were so-called EcoDiesel® vehicles with *reduced emissions*—a label only made possible by concealing the vehicles' true emissions levels from regulators.

200.   Defendants had a duty to disclose the emissions deception they engaged in with respect to the vehicles at issue because knowledge of the deception and its details were known and/or accessible only to Defendants, Defendants had exclusive knowledge as to implementation and maintenance of their deception, and Defendants knew the facts were unknown to or not reasonably discoverable by Plaintiffs or Class members.

201.   Defendants also had a duty to disclose because they made general affirmative representations about the qualities of their vehicles with respect to emissions standards which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding their emissions deception, the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue.

202.    Having volunteered to provide information to Plaintiffs and the Class, Defendants had the duty to disclose the entire truth. These omitted and concealed facts were material because they directly affect the value of the Class Vehicles purchased or leased by Plaintiff and Class members. Whether a manufacturer's products comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. Defendants represented to Plaintiffs and Class members that they were purchasing or leasing *reduced emission* vehicles, and certification testing appeared to confirm this—except that, secretly, Defendants had thoroughly subverted the testing process.

203.    Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that their vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Defendants money, and Defendants did so at the expense of Plaintiffs and Class members.

204.    On information and belief, Defendants have still not made full and adequate disclosures and continue to defraud Plaintiffs and Class members by concealing material information regarding both the emissions qualities of their vehicles and their emissions deception.

205.    Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly compliant cars manufactured by Defendants, and/or would not have continued to drive their heavily polluting

vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class members' actions were justified. Defendants were in exclusive control of the material facts, and such facts were not known to the public, Plaintiffs, or Class members.

206.    Because of the concealment and/or suppression of the facts, Plaintiffs and Class members have sustained damages because they purchased vehicles that were equipped with undisclosed AECDs that functioned as a "defeat device" and were not legally sold (due to the fact that Fiat Chrysler never obtained valid COC for the Class Vehicles), own vehicles that they overpaid for as a result of Defendants' concealment of the true quality and quantity of those vehicles' emissions and Defendants' failure to timely disclose the defect or defective design of the EcoDiesel® engine system, the actual emissions qualities and quantities of hundreds of thousands of Ram- and Jeep-branded vehicles, and the serious issues engendered by Defendants' corporate policies, which may require time-consuming, expensive repairs. Had Plaintiffs and Class members been aware of Defendants' emissions deceptions with regard to the vehicles at issue, and their callous disregard for compliance with applicable federal and state law and regulations, Plaintiffs and Class members who purchased or leased new or previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

207.    Accordingly, Defendants are liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

208.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and the representations that Defendants made to them, in order to enrich Defendants. Defendants'

conduct warrants an assessment of punitive damages in an amount sufficient to deter such

conduct in the future, which amount is to be determined according to proof.

209.    Plaintiffs plead this count pursuant to the laws of West Virginia, where

Defendants have significant operations, on behalf of all members of the Class. As necessary, and

in the alternative, Plaintiffs do and may allege further sub-classes, based on the residences at

pertinent times of members of the Class, to allege fraudulent concealment under the laws of

states other than West Virginia and North Carolina.

**COUNT III**
**BREACH OF CONTRACT**

210.    Plaintiffs incorporate by reference all preceding allegations as though fully set

forth herein.

211.    Plaintiffs bring this Count on behalf of himself, the Nationwide Class, and all

Subclasses.

212.    Defendants' misrepresentations and omissions alleged herein, including

Defendants' failure to disclose the existence of the "defeat device" and/or defective design as

alleged herein, caused Plaintiffs and the other Class members to make their purchases or leases

of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other

Class members would not have purchased or leased these Class Vehicles, would not have

purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or

leased less expensive alternative vehicles that did not contain the "defeat device." Accordingly,

Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the

benefits of their bargains.

213.    Each and every sale or lease of a Defective Vehicle constitutes a contract between

Defendants and the purchaser or lessee. Defendants breached these contracts by selling or leasing

62

Plaintiff's and the other Class members' Class Vehicles and by misrepresenting or failing to disclose the existence of the defeat device and/or defective design, including information known to Defendants rendering each Defeat Device Vehicle non-compliant with applicable emissions standards, and thus less valuable, than vehicles not equipped with defeat devices.

214.    As a direct and proximate result of Defendants' breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT IV**
**IMPLIED AND WRITTEN WARRANTY**
**Magnuson - Moss Warranty Act (15 U.S.C. §§ 2301, et seq.)**

215.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

216.    Plaintiffs assert this cause of action on behalf of themselves, the Nationwide Class, and all Subclasses.

217.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 15 U.S.C. § 2310(d).

218.    Defendants' Class Vehicles are a "consumer product," as that term is defined in 15 U.S.C. § 2301(1).

219.    Plaintiffs and Class members are "consumers," as that term is defined in 15 U.S.C. § 2301(3).

220.    Each Defendant is a "warrantor" and "supplier" as those terms are defined in 15 U.S.C. § 2301(4) and (5).

221.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied or written warranty.

222.     As described herein, Defendants provided Plaintiffs and Class members with "implied warranties" and "written warranties" as those terms are defined in 15 U.S.C. § 2301.

223.     Defendants have breached these warranties as described in more detail above. Without limitation, Defendants' Class Vehicles are defective, as described above, which resulted in the problems and failures also described above.

224.     By Defendants' conduct as described herein, including knowledge of the defects inherent in the vehicles and Defendants' action, and inaction, in the face of the knowledge, Defendants have failed to comply with their obligations under their written and implied promises, warranties, and representations.

225.     In their capacity as warrantors, and by the conduct described herein, any attempts by Defendants to limit the implied warranties in a manner that would exclude coverage of the defective software and systems is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defective the software and supporting systems is null and void.

226.     All jurisdictional prerequisites have been satisfied.

227.     Plaintiffs and members of the Class are in privity with Defendants in that they purchased the software from Defendants or their agents.

228.     As a result of Defendants' breach of warranties, Plaintiffs and Class members are entitled to revoke their acceptance of the vehicles, obtain damages and equitable relief, and obtain costs pursuant to 15 U.S.C. § 2310.

### COUNT V
### UNJUST ENRICHMENT

229.     Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

230.     Plaintiffs bring this count on behalf of himself and, where applicable, the Nationwide Class and all Subclasses.

231.     Plaintiffs and members of the Class conferred a benefit on Defendants by, inter alia, using (and paying a premium for) its vehicles.

232.     Defendants have retained this benefit, and know of and appreciate this benefit.

233.     Defendants were and continue to be unjustly enriched at the expense of Plaintiffs and Class members.

234.     Defendants should be required to disgorge this unjust enrichment.

### COUNT VI
### VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT
### (6 Del. Code § 2513, et seq.)

235.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

236.     Plaintiffs bring this action on behalf of themselves, the Nationwide Class, and all Subclasses.

237.     Defendants are "person[s]" within the meaning of 6 Del. Code § 2511(7).

238.     The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).

239.     In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems

and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real-world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

240.    Plaintiffs and Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and National Class members did not and could not unravel Defendants' deception on their own.

241.    Defendants thus violated the Act by, at minimum: by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

242.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Delaware CFA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

243.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By

installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

Delaware CFA.

244.    Defendants knew the true nature of its "clean" diesel engine system, but

concealed all of that information until recently. Defendants were also aware that it valued profits

over environmental cleanliness, efficiency, and compliance with the law, and that it was

manufacturing, selling, and distributing vehicles throughout the United States that did not

comply with EPA regulations. Defendants concealed this information as well.

245.    Defendants intentionally and knowingly misrepresented material facts regarding

the Class Vehicles with intent to mislead Plaintiff and the National Class.

246.    Defendants knew or should have known that their conduct violated the Delaware

CFA.

247.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and

safety risks of the Class Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and

distributing vehicles throughout the United States that did not comply with EPA

regulations;

B.    intentionally concealed the foregoing from regulators, Plaintiffs, Class

members; and/or

C.    made incomplete representations about the environmental cleanliness and

efficiency of the Class Vehicles generally, and the use of the defeat device in particular,

while purposefully withholding material facts from Plaintiff that contradicted these representations.

248.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. Associated stigma may also accelerate depreciation.

249.    Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system, including the undisclosed AECDs, were material to Plaintiffs and the National Class.

250.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness, reliability, and efficiency of the Class Vehicles, including their quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Class Vehicles.

251.    Plaintiffs and the National Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the National Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

252.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Delaware CFA. All owners of Class Vehicles suffered ascertainable loss in that they did not receive the benefit of their bargain as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

253.     Defendants' violations present a continuing risk to Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

254.     As a direct and proximate result of Defendants' violations of the Delaware CFA, Plaintiffs and the National Class have suffered injury-in-fact and/or actual damage.

255.     Plaintiffs seeks damages under the Delaware CFA for injury resulting from the direct and natural consequences of Defendants' unlawful conduct. *See, e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983). Plaintiffs also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

256.     Defendants engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

## COUNT VII
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (6 Del. Code §§ 2-314 and 2A-212)

257.     Plaintiffs reallege and incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

258.     Plaintiffs brings this action on behalf of themselves, the Nationwide Class, and all Subclasses.

259.     Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

260.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

261. The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

262. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 6 Del. C. §§ 2-314 and 2A-212)

263. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

264. Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

265. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other National Class members have been damaged in an amount to be proven at trial.

## COUNT VIII
## BREACH OF EXPRESS WARRANTY
### (6 Del. Code §§ 2-313 and 2A-210)

266. Plaintiffs reallege and incorporates by reference all preceding allegations as though fully set forth herein.

267. Plaintiffs bring this action on behalf of themselves, the Nationwide Class, and all Subclasses.

268.     Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

269.     With respect to leases Defendants are and were at all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

270.     The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

271.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

272.     The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

273.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

274.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

275.     As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

276.     Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other National Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

277.     Plaintiffs and the National Class members experienced defects within the warranty period. Despite the existence of warranties, Defendants failed to inform Plaintiff and National Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

278.     Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

279.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other National Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

280.    Accordingly, recovery by Plaintiffs and the other National Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other National Class members, seeks all remedies as allowed by law.

281.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other National Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

282.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other National Class members' remedies would be insufficient to make Plaintiffs and the other National Class members whole.

283.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs and the other National Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other National Class

members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

284.    Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Class Vehicles to evade clean air standards.

285.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs and the other National Class members have been damaged in an amount to be determined at trial.

**B.    West Virginia State Claims**

**COUNT IX**
**VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT**
**(W. Va. Code § 46A-1-101, et seq.)**

286.    Plaintiff Johnson incorporates by reference each preceding paragraph as though fully set forth herein.

287.    Plaintiff Johnson brings this action on behalf of himself and the West Virginia Class.

288.    Defendants, Plaintiff Johnson, and the West Virginia Class are "persons" within the meaning of W. Va. Code § 46A-1-102(31). Plaintiff Johnson and the West Virginia Class members are "consumers" within the meaning of W. Va. Code §§ 46A-1-102(2) and 46A-1-102(12).

289.    Defendants are engaged in "trade" or "commerce" within the meaning of W. Va. Code § 46A-6-102(6).

290.    The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code § 46A-6-104.

291.    In the course of Defendants' business, Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "EcoDiesel®" engines in the Class Vehicles. The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real-world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

292.    Plaintiff Johnson and West Virginia Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiff Johnson and West Virginia Class members did not and could not unravel Defendants' deception on their own.

293.    Defendants thus violated the West Virginia CCPA, at a minimum by: representing that the Class Vehicles had characteristics, uses, benefits and qualities which they do not have; representing that the Class Vehicles are of a particular standard, quality and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and engaging in other conduct creating a likelihood of confusion or of misunderstanding. *See* W.Va. Code § 46A-6-102(7)(E), (G), (I) and (L).

294.    Fiat Chrysler engaged in misleading, false, unfair or deceptive acts or practices that violated the West Virginia CCPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

295.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, FCA violated federal law and therefore engaged in conduct that violates the West Virginia CCPA.

296.    Fiat Chrysler knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Fiat Chrysler also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

297.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff Johnson and the West Virginia Class.

298.    Defendants knew or should have known that their conduct violated the West Virginia CCPA.

299.    Defendants owed Plaintiff Johnson and West Virginia Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

    A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    B.    intentionally concealed the foregoing from regulators, Plaintiff Johnson, Class members; and/or

    C.    Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiff Johnson that contradicted these representations.

300.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the Class Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed. The value of the Class Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

301.    Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiff Johnson and the West Virginia Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

302.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff Johnson and West Virginia Class members, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at FCA, and the true value of the Class Vehicles.

303.     Plaintiff Johnson and West Virginia Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. Plaintiff Johnson and the West Virginia Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiff Johnson and the West Virginia Class also suffered lost or diminished use.

304.     Defendants had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the West Virginia CCPA in the course of its business.

305.     Defendants' violations present a continuing risk to Plaintiff Johnson as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

306.     Pursuant to W. Va. Code § 46A-6-106(a), Plaintiff Johnson and the West Virginia Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the West Virginia CCPA.

307.     Additional notice of the defect from the consumer to the manufacturer pursuant to W. Va. Code § 46A-6-106(c) is not required since the EPA has notified FCA on behalf of the consumers through its Notice of Violation dated January 12, 2017, and in fact FCA is required to

notify the Class members of the defect.  Moreover, additional notice would be futile because there is no effective repair for the defect that will maintain the performance qualities (including acceleration and fuel efficiency) of the Defective Vehicles.  Nonetheless, on March 14, 2017, Plaintiff Johnson sent a letter to all Defendants complying with W. Va. Code § 46A-6-106(c).  Because Defendants cannot propose an effective cure within the requisite time period, Plaintiff Johnson seeks all damages and relief against Defendants to which Plaintiff Johnson and the West Virginia Class are entitled.

### COUNT X
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (W. Va. Code §§ 46-2-314 and 46-2A-212)

308.    Plaintiff Johnson realleges and incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

309.    Plaintiff Johnson brings this Count on behalf of himself and the West Virginia Class.

310.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under W. Va. Code § 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

311.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

312.    The Class Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

313.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to W. Va. Code §§ 46-2-314 and 46-2A-212.

314.    Defendants sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The vehicles were not in merchantable condition because their defective design violated state and federal laws. The vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

315.    Defendants' breach of the implied warranty of merchantability caused damage to the Plaintiff Johnson and West Virginia Class members who purchased or leased the defective vehicles. The amount of damages due will be proven at trial.

**COUNT XI**
**BREACH OF EXPRESS WARRANTY**
**(W. Va. Code §§ 46-2-313 and 46-2A-210)**

316.    Plaintiff Johnson realleges and incorporates by reference all preceding allegations as though fully set forth herein.

317.    Plaintiff Johnson brings this Count on behalf of himself and the West Virginia Class.

318.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under W. Va. Code §§ 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

319.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

320.    The Class Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

321.    Defendants made numerous representations, descriptions, and promises to Plaintiff Johnson and Class members regarding the performance and emission controls of their vehicles. The Clean Air Act requires Defendants to provide two types of warranties for light-

duty vehicles—a "Performance Warranty" and a "Design and Defect Warranty." Defendants provided an express warranty through a Federal Emissions Performance Warranty required by the EPA. The Performance Warranty applies to required repairs during the first two years or 24,000 miles if a vehicle fails an emissions test with certain components being covered for up to eight years or 80,000 miles. The Design and Defect Warranties required by the EPA covers repairs to the emission system and related parts for two years or 24,000 miles with certain major components being covered for up to eight years or 80,000 miles.

322.    Defendants, however, knew or should have known that their warranties were false and/or misleading. Defendants were aware that they had installed defeat devices in the vehicles they sold to Plaintiff Johnson and West Virginia Class members and therefore, knew that the emission systems contained defects.

323.    Plaintiff Johnson and Class members reasonably relied on Defendants' representations and express warranties concerning emissions when purchasing or leasing vehicles. The vehicles, however, did not perform as was warranted. Unbeknownst to Plaintiff Johnson and Class members, those vehicles included devices that caused them to pollute at higher than allowable levels. Those devices are defects. Accordingly, Defendants breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff Johnson and Class members.

324.    Any opportunity to cure the express breach is unnecessary and futile.

325.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiff Johnson and Class members suffered significant damages and seek damages in an amount to be determined at trial.

## COUNT XII
## BREACH OF NEW MOTOR VEHICLE WARRANTY
## (WEST VIRGINIA "LEMON LAW")
### (W. Va. Code §§ 46A-6A-1, et seq.)

326.    Plaintiff Johnson realleges and incorporates by reference all paragraphs as though fully set forth herein.

327.    Plaintiff Johnson brings this Count on behalf of himself and the West Virginia Class.

328.    The West Virginia Class members who purchased or leased the Class Vehicles in West Virginia are "consumers" within the meaning of W. Va. Code § 46A-6A-2(1).

329.    Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of W. Va. Code § 46A-6A-2(2).

330.    The Class Vehicles are "motor vehicles" as defined by W. Va. Code § 46A-6A-2(4).

331.    In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty (NVLW) for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

332.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

333.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emissions systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain

major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emissions control unit (ECU), and the onboard emissions diagnostic device or computer.

334.    The EPA requires vehicle manufacturers to issue Defect Warranties with respect to their vehicles' emissions systems. Thus, FCA also provides an express warranty to its vehicles through a Federal Emissions Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emissions control components, for eight years or 80,000 miles, whichever comes first.

335.    As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to Plaintiff Johnson and the West Virginia Class members. Defendants' warranties formed the basis of the bargain that was reached when Plaintiff Johnson and other Class members purchased or leased their Class Vehicles equipped with the non-compliant EcoDiesel® engine system.

336.    The emissions defect in the Class Vehicles existed from the date of the original sale of the new vehicle to the consumer but could not be detected by a reasonable consumer exercising reasonable care and diligence. Therefore, applicable express warranties for the Class Vehicles containing the defeat device software would be extended.

337.    Additional notice of the defect from the consumer to the manufacturer pursuant to W. Va. Code §§ 46A-6A-3(a) and 5(c) is not required since the EPA has notified FCA on behalf of the consumers through its Notice of Violation dated January 12, 2017, and in fact FCA is

required to notify the Class members of the defect.  Moreover, additional notice would be futile

because there is no effective repair for the defect that will maintain the performance qualities

(including acceleration and fuel efficiency) of the Defective Vehicles.  Nonetheless, on March

14, 2017, Plaintiff Johnson sent a letter to all Defendants complying with W. Va. Code §§ 46A-

6A-3(a) and 5(c). Because Defendants cannot propose an effective cure within the requisite time

period, Plaintiff Johnson seeks all damages and relief to which Plaintiff Johnson and the West

Virginia Class are entitled against Defendants under the West Virginia Lemon Law.

338.     As a direct and proximate result of Defendants' breaches of their duties

under West Virginia's Lemon Law, the West Virginia Class members received goods whose

defect substantially impairs their value. The West Virginia Class has been damaged by the

compromised functioning and/or non-use of their Class Vehicles.

339.     Defendants have a duty under § 46A-6A-3 to make all repairs necessary to correct

the defect herein described to bring the Class Vehicles into conformity with all written

warranties. In the event that Defendants cannot affect such repairs, they have a duty to replace

each Class Vehicle with a comparable new motor vehicle that conforms to the warranty.

340.     As a result of Defendants' breaches, Plaintiff Johnson and the West Virginia

Class are entitled to the following:

A.     Revocation of acceptance and refund of the purchase price, including, but not

limited to, sales tax, license and registration fees, and other reasonable expenses

incurred for the purchase of the new motor vehicle, or if there be no such

revocation of acceptance, damages for depreciated value of the motor vehicle

associated with any future repairs required, including but not limited to potential

84

reduced performance such as a reduction in calculated fuel economy, a decrease in peak horsepower; and/or a decrease in peak torque;

B.    Damages for the cost of repairs reasonably required to conform the motor vehicle to the express warranty;

C.    Damages for the loss of use, annoyance or inconvenience resulting from the nonconformity, including, but not limited to, reasonable expenses incurred for replacement transportation during any period when the vehicle is out of service by reason of the nonconformity or by reason of repair; and

D.    Reasonable attorney fees.

W. Va. Code § 46A-6A-4(b)(1)-(4).

**C.    North Carolina State Claims**

**COUNT XIII**
**VIOLATIONS OF THE NORTH CAROLINA UNFAIR**
**AND DECEPTIVE TRADE PRACTICES ACT**
**(N.C. Gen. Stat. §§ 75-1.1, et seq.)**

341.    Plaintiff Webster realleges and incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

342.    Plaintiff Webster brings this action on behalf of himself and the North Carolina Class.

343.    Plaintiff Webster and the North Carolina Class members are persons under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.* ("NCUDTPA").

344.     Defendants' acts and practices complained of herein were performed in the course of Defendants' trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-1.1(b).

345.     The NCUDTPA makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA.  N.C. Gen. Stat. § 75-16.

346.     In the course of Defendants' business, Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed EcoDiesel® engines in the Class Vehicles. The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real-world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

347.     Plaintiff Webster and North Carolina Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology.  Plaintiff Webster and North Carolina Class members did not and could not unravel Defendants' deception on their own.

348.    Defendants thus violated the provisions of the NCUDTPA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles; and (5) otherwise engaging in conduct likely to deceive.

349.    Fiat Chrysler engaged in misleading, false, unfair or deceptive acts or practices that violated the NCUDTPA by installing, failing to disclose and/or actively concealing the defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

350.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  Defeat devices like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal defeat devices in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the NCUDTPA.

351.    Fiat Chrysler knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Fiat Chrysler also knew that it valued profits over environmental cleanliness,

efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

352.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff Webster and the North Carolina Class.

353.    Defendants knew or should have known that its conduct violated the NCUDTPA.

354.    Defendants owed Plaintiff Webster and North Carolina Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

> A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;
>
> B.    intentionally concealed the foregoing from regulators, Plaintiff Webster, Class members; and/or
>
> C.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiff Webster that contradicted these representations.

355.    Defendants fraudulently concealed the defeat device and the true cleanliness, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Class Vehicles has therefore plummeted.  In light of the stigma Defendants' misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

356.     Defendants' fraudulent use of the defeat device and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiff Webster and the North Carolina Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

357.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff Webster and North Carolina Class members, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the FCA brand, the devaluing of environmental cleanliness and integrity at FCA, and the true value of the Class Vehicles.

358.     Plaintiff Webster and North Carolina Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiff Webster and the North Carolina Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiff Webster also suffered diminished value of their vehicles, as well as lost or diminished use.

359.     Defendants had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the NCUDTPA in the course of their business.

360.     Defendants' violations present a continuing risk to Plaintiff Webster as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

361.    As a result of the foregoing wrongful conduct of Defendants, Plaintiff Webster and the North Carolina Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to treble damages, an order enjoining Defendants' deceptive and unfair conduct, court costs and reasonable attorneys' fees, and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

## COUNT XIV
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.C.G.S.A. §§ 25-2-314 and 252A-212)

362.    Plaintiff Webster realleges and incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

363.    Plaintiff Webster brings this Count on behalf of himself and the North Carolina Class.

364.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.C.G.S.A. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

365.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.C.G.S.A. § 25-2A-103(1)(p).

366.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C.G.S.A. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).5.

367.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.C.G.S.A. § 25-2-314 and N.C.G.S.A. § 25-2A-212.

368.    Defendants sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The vehicles were not in merchantable condition because their defective design violated state and federal

laws. The vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

369.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff Webster and the other North Carolina Class members have been damaged in an amount to be proven at trial.

### COUNT XV
### BREACH OF EXPRESS WARRANTY
### (N.C.G.S.A. §§ 25-2-313 and 252A-210)

370.    Plaintiff Webster realleges and incorporates by reference all preceding allegations as though fully set forth herein.

371.    Plaintiff Webster brings this Count on behalf of himself and the North Carolina Class.

372.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.C.G.S.A. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

373.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.C.G.S.A. § 25-2A-103(1)(p).

374.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C.G.S.A. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).

375.    Defendants made numerous representations, descriptions, and promises to Plaintiff Webster and Class members regarding the performance and emission controls of their vehicles. The Clean Air Act requires Defendants to provide two types of warranties for light-duty vehicles—a "Performance Warranty" and a "Design and Defect Warranty." Defendants provided an express warranty through a Federal Emissions Performance Warranty required by the EPA. The Performance Warranty applies to required repairs during the first two years or

24,000 miles if a vehicle fails an emissions test with certain components being covered for up to eight years or 80,000 miles. The Design and Defect Warranties required by the EPA covers repairs to the emission system and related parts for two years or 24,000 miles with certain major components being covered for up to eight years or 80,000 miles.

376.    Defendants, however, knew or should have known that their warranties were false and/or misleading. Defendants were aware that they had installed defeat devices in the vehicles they sold to Plaintiff Webster and Class members and therefore, knew that the emission systems contained defects.

377.    Plaintiff Webster and Class members reasonably relied on Defendants' representations and express warranties concerning emissions when purchasing or leasing vehicles. The vehicles, however, did not perform as was warranted. Unbeknownst to Plaintiff Webster and Class members, those vehicles included devices that caused them to pollute at higher than allowable levels. Those devices are defects. Accordingly, Defendants breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff Webster and Class members.

378.    Any opportunity to cure the express breach is unnecessary and futile.

379.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiff Webster and Class members suffered significant damages and seek damages in an amount to be determined at trial.

## X.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class, the West Virginia Class, and the North Carolina Class, and any other applicable classes or subclasses, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

A.    Certification of the proposed Nationwide Class and/or Subclasses under Federal Rule of Civil Procedure 23, including appointment of Plaintiffs' counsel as Class Counsel, certification of the West Virginia Class, and certification of the North Carolina Class, and appointment of Plaintiffs' counsel as Class Counsel;

B.    An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Injunctive relief in the form of a recall or free replacement;

D.    A declaration that the defeat device software in the Class Vehicles is illegal and that the Class Vehicles are defective;

E.    Public injunctive relief necessary to protect public health and welfare, and to remediate the environmental harm caused by the Class Vehicles' unlawful emissions;

F.    Costs, restitution, damages, and disgorgement in an amount to be determined at trial;

G.    Rescission of all Class Vehicle purchases or leases, including reimbursement and/or compensation of the full purchase price of all Class Vehicles, including taxes, licenses, and other fees;

H.    Damages under the Magnuson-Moss Warranty Act;

I.    For treble and/or punitive damages as permitted by applicable laws;

J.    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

K.    An award of costs and attorneys' fees; and

L.    Such other or further relief as the Court may deem appropriate, just, and equitable.

## XI.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any

and all issues in this action so triable of right.

DATED this 28th day of March, 2017.

BAILEY & GLASSER, LLP

By */s/ Benjamin L. Bailey*
    Benjamin L. Bailey (WVSB# 200)
    Eric B. Snyder (WVSB# 9143)
    Jonathan D. Boggs (WVSB# 7927)
    Katherine E. Charonko (WVSB# 11647)
    BAILEY & GLASSER, LLP
    209 Capitol Street
    Charleston, WV 25301
    (304) 345-6555, Fax (304) 342-1110
    bbailey@baileyglasser.com
    esnyder@baileyglasser.com
    jboggs@baileyglasser.com
    kcharonko@baileyglasser.com

    Lynn Lincoln Sarko, *pro hac vice forthcoming*
    Derek W. Loeser, *pro hac vice forthcoming*
    Gretchen Freeman Cappio, *pro hac vice forthcoming*
    Ryan McDevitt, *pro hac vice forthcoming*
    KELLER ROHRBACK L.L.P.
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101
    (206) 623-1900, Fax (206) 623-3384
    lsarko@kellerrohrback.com
    dloeser@kellerrohrback.com
    gcappio@kellerrohrback.com
    rmcdevitt@kellerrohrback.com

Lesley E. Weaver, *pro hac vice forthcoming*
Robyn R. English, *pro hac vice forthcoming*
BLEICHMAR FONTI & AULD, LLP
1999 Harrison Street, Suite 670
Oakland, CA 94612
(415) 445-4003, Fax: (415) 445-4020
lweaver@bfalaw.com
renglish@bfalaw.com

J. Gerard Stranch IV,  *pro hac vice forthcoming*
Joe P. Leniski, Jr., *pro hac vice forthcoming*
BRANSTETTER, STRANCH & JENNINGS, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801, Fax (615) 250-3937
gerards@bsjfirm.com
joeyl@bsjfirm.com

Joseph F. Rice, *pro hac vice forthcoming*
Ann Ritter, *pro hac vice forthcoming*
MOTLEY RICE, LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9000, Fax (843) 216-9450
jrice@motleyrice.com
aritter@motleyrice.com

Elizabeth Cabraser, *pro hac vice forthcoming*
LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
(415) 956-1000, Fax (415) 956-1008
ecabraser@lchb.com

David S. Stellings, *pro hac vice forthcoming*
LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
250 Hudson Street, 8th Floor
New York, NY 10013
(212) 355-9500, Fax (212) 355-9592
dstellings@lchb.com

Paul J. Geller, *pro hac vice forthcoming*
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Rd., Suite 500
Boca Raton, FL 33432
(561) 750-3000; Fax (561) 750-3364
pgeller@rgrdlaw.com

W. Daniel Miles, III, *pro hac vice forthcoming*
Archie I. Grubb, II, *pro hac vice forthcoming*
Beasley, Allen, Crow, Methvin, Portis &
    Miles, P.C.
218 Commerce Street
Montgomery, AL  36104
(334) 269-2343; Fax (334) 954-7555
dee.miles@beasleyallen.com
archie.grubb@beasleyallen.com